[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 8, 2010
JOHN LEY
CLERK

_____

No. 08-15590

_____

D. C. Docket No. 07-00243-CV-3-LAC-EMT

WYON DALE CHILDERS,

Petitioner-Appellant,

versus

WILLIE L. FLOYD, Warden -
Glades Correctional
Institution,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(June 8, 2010)

Before TJOFLAT and BARKETT, Circuit Judges, and BARZILAY,* Judge.

_____

* Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

BARZILAY, Judge:

Petitioner-Appellant Wyon Dale Childers ("Appellant") appeals the United States District Court for the Northern District of Florida's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Appellant contends here, as he did unsuccessfully in the district court, that a Florida state trial court impermissibly constrained his right under the Confrontation Clause of the Sixth Amendment of the United States Constitution to cross-examine the State's star witness against him. For the reasons stated below, this court reverses the district court and instructs the district court to grant Appellant's petition.

## I. Background & Jurisdiction

### A. Preliminary Events & Willie Junior's Plea Bargain

On June 17, 2002, the Florida Circuit Court for Escambia County handed down an indictment against Appellant for one count of money laundering, one count of bribery, and one count of unlawful compensation or reward for official behavior. Record Evidence ("R.E.") Doc. 8 Ex. A at 1-3. The State alleged that Appellant, a county commissioner, made payments to Willie Junior ("Junior"), another county commissioner, to secure Junior's vote in favor of the County's purchase of the Pensacola Soccer Complex from Joe Elliott ("Elliott"). Allegedly, Elliott in turn provided Appellant and Junior with monetary kickbacks upon the

2

county's purchase of the property.

Several months before Appellant or Elliott went to trial, the State struck a plea bargain with Junior, in which he agreed to plea *nolo contendere* to numerous charges, including bribery, extortion, grand theft, and racketeering. In return for his cooperation with the State, which required Junior to inform the State and the grand jury of any and all criminal offenses committed by him or others of which he had knowledge, the State granted him immunity from prosecution for further related offenses and agreed to seek prison time of only 18 months rather than the 125-year maximum sentence he otherwise could have faced. The agreement also provided that

> if any information Junior provides is determined to be false, this grant of immunity is withdrawn and, additionally, the State may prosecute Junior for offenses relating to the giving of false statements or perjury. . . . The parties agree that the State may revoke this agreement if, in the sole discretion of the State Attorney, any of the following circumstances have occurred:
> A. Junior's refusal to cooperate as provided in this agreement. [sic]
> B. Junior's statements or testimony are incomplete or untruthful;
> C. Junior failed to comply with any of the terms of this agreement
> . . . .

R.E. Doc. 8 Ex. C at 1015.

As the State prepared for both Elliot and Appellant's separate trials, Junior met with State investigators several times and provided details of the meetings he

3

had with Elliot and Appellant. In December 2002, Junior served as the State's star witness at Elliott's trial, repeating the information he had provided to the State in prior meetings implicating Elliot and the Appellant. As noted, the essence of the scheme about which Junior testified was that Appellant met with him multiple times to offer him a bribe in exchange for his voting in favor of buying the soccer complex from Elliot. The trial ended with Elliot's acquittal.

Approximately one month after Elliot's acquittal, Junior met with a State investigator and provided additional facts that implicated Appellant more directly in the soccer stadium deal, some of which conflicted with Junior's prior statements. Specifically, Junior previously had stated that when Appellant wrote "100/100" on a notepad and passed it to him, he and Appellant did not discuss the meaning of the note and that Junior assumed the note indicated that they each would receive $100,000 if the Pensacola soccer complex deal was approved. In his new statement, Junior claimed, for the first time, that Appellant actually told him, "[I]f the soccer complex goes through, it will be a hundred for you and a hundred for me," when Appellant passed him the note. Before the Elliott acquittal, Junior also maintained that the "100/100" incident occurred after the County Commission voted to appraise the soccer complex property. In his revised account, Junior stated that the incident took place before the appraisal vote and

4

asserted for the first time that, after the "100/100" note episode, Appellant specifically told him that Elliott would speak with him about the matter.

In addition, Junior previously had told the state that Appellant had given him a large cooking pot filled with money, but that he and Appellant had no conversation about or during the event. After Elliot's acquittal, Junior claimed that Appellant told him that he had taken $25,000 from the pot. Junior later amended that statement to say that Appellant told him that he first took $10,000 and then took another $25,000 from the pot. In his third version of events, Junior also stated that while giving Junior the pot of money, Appellant repeatedly exclaimed that he was "sick and tired of not being able to get three votes," contrary to Junior's earlier statements that there had been no conversation during this transaction. *See* R.E. Doc. 8 Ex. M at 4-5, Doc. 26 at 7.

Upon hearing these new statements, the State Attorney attempted to revoke Junior's plea agreement by filing a Notice of Revocation of Terms of Plea Agreement ("Notice of Revocation" or "Notice") in Junior's criminal case. In support, the State Attorney charged, *inter alia*, that Junior changed his testimony and failed to give complete statements in the Elliott trial. Although the plea agreement explicitly left its revocability to the State Attorney's sole discretion, the state trial court *sua sponte* intervened and disallowed the revocation on the

grounds that Junior's revised statements were "not under oath at trial or hearing," and therefore not technically a violation of the plea agreement. R.E. Doc. 8 Ex. M at 7. The State then filed an amended information against Appellant with the same offenses, but supported with the additional statements provided by Junior after Elliot's acquittal. R.E. Doc. 8 Ex. A at 6-7.

**B. Appellant's State Court Trial**

Prior to his own trial, Appellant filed a notice of intent to use party opponent statements, to wit, (1) the State Attorney's claims contained in the Notice of Revocation, (2) the State Attorney's statements at the Notice of Revocation hearing, and (3) the State Attorney's statements from the Elliot trial, in order to explore Junior's motivations for changing his story. Appellant hoped to use these materials for two reasons: (1) to examine whether Junior modified his testimony because he perceived that the Elliott acquittal jeopardized his plea bargain and so he wanted to assure Appellant's conviction, and (2) to explore whether the Notice of Revocation compelled Junior to stick to his new, enhanced version of events because he feared the successful revocation of his plea bargain if he changed his testimony again, returning to his prior story. Appellant concurrently filed a motion *in limine* to exclude evidence of the trial court's quashing of the Notice, because he believed that it was irrelevant, that its

6

probative value, if any, was outweighed by its unfair prejudice, and that it constituted improper bolstering of Junior's testimony. The trial court ruled that Appellant could not discuss the Elliott case verdict because, among other reasons, under Fla. Stat. § 90.403, "the prejudice would outweigh any probative value," and excluded the Notice of Revocation and the court's ruling on it as irrelevant.[1] R.E. Doc. 8 Ex. B at 2-3. The court further stated that if it were to admit the State Attorneys' Notice of Revocation, it would be obligated to admit the quashing of the Notice as well. R.E. Doc. 8 Ex. B at 3.

During Appellant's trial, Junior testified to the following, as succinctly explained by the district court:

> Mr. Junior testified that on May 31, 2001, he went to [Appellant]'s office, and [Appellant] mentioned that he was "sick and tired of trying to get three votes" and would like to try to get some things done. Mr. Junior testified that he asked [Appellant] for $10,000.00, and [Appellant] wrote out a check and gave it to him. Mr. Junior identified a check dated May 31, 2001, made payable to him in the amount of $10,000.00 and authored by [Appellant]. He testified that although the memo line stated "Ruth [Appellant's wife]" and referred to six months at eight percent, there was no discussion about his paying back the funds to [Appellant]. Mr. Junior testified that he exchanged the check for a cashier's check and deposited the cashier's check.
> Mr. Junior further testified that between August and September of 2001, he met [Appellant] at [Appellant]'s office. He testified that he and [Appellant] went to a conference table, and [Appellant] wrote

---

[1] Florida has codified its rules of evidence in Title VII Chapter 90 of the Florida Statutes.

7

"100,000/100,000" on a legal pad and stated he and Mr. Junior would each receive "a hundred." Mr. Junior testified that he believed the note represented that he would receive $100,000 and [Appellant] would receive $100,000 if the County's purchase of the Pensacola Soccer Complex was completed.

Mr. Junior also testified that he met Joe Elliott in 2001. Mr. Junior testified that Mr. Elliott came to his office for a meeting, and based upon that meeting, Mr. Junior added an item to the agenda of the County Commission meeting on October 4, 2001, for the county to obtain an appraisal for the possible purchase of the Pensacola Soccer Complex. The Commission voted in favor of the appraisal. Mr. Junior testified that after County staff obtained the appraisal, he added an item to the agenda of the Commission meeting on November 1, 2001, for the county to purchase the Pensacola Soccer Complex.

Mr. Junior testified that on November 24, 2001, he received a phone call from [Appellant] to come to his office. The two men met at [Appellant]'s office, and during the course of the meeting, [Appellant] gave Mr. Junior a pot with money in it. Mr. Junior described the pot as a stainless steel pot, approximately 10-11 inches wide and 9-10 inches deep. . . . Mr. Junior testified that when [Appellant] presented him with the pot, [Appellant] said "I got 25–25 out." Mr. Junior testified that he received the money in the pot "for my vote on the soccer complex."

Mr. Junior testified he subsequently took $40,000 from the pot and took it to [Appellant] in exchange for a $40,000 cashier's check, because [Appellant] had told him that if he needed to exchange some of the cash for a check, he should bring [Appellant] the cash, and he would exchange it for a cashier's check. Mr. Junior identified a cashier's check dated December 5, 2001, in the amount of $40,000 as the check he received from [Appellant] and deposited into his checking account. Mr. Junior testified that he also received separate checks from [Appellant] in the amounts of $7,000, $10,000, $3,000, $11,000, and $9,000. Mr. Junior additionally testified that he ultimately signed two promissory notes, on behalf of the Junior Funeral Home and himself personally, in favor of [Appellant], but Mr. Junior testified that [Appellant] told him that he would not hold

8

Mr. Junior responsible for the notes and never attempted to obtain repayment or security, and Mr. Junior never expected or attempted to pay on the notes.

R.E. Doc. 26 at 13-15 (citations omitted).

After direct examination, Appellant's counsel cross-examined Junior for approximately ten hours, during which he elicited the details of Junior's plea agreement and impeached Junior's testimony with prior inconsistent statements. With respect to his own indictment and plea agreement, Junior informed the jury that

on April 30, 2002, he was indicted for racketeering, four counts of bribery, four counts of extortion, and grand theft. He testified that he learned that he was facing 125 years in prison for the crimes. Mr. Junior testified that he had a series of meetings with prosecutors in the middle of June of 2002, during which he told them a sequence of events. He testified that after the meetings, he gave a taped interview with investigators on June 15, 2002. Mr. Junior testified that two days after he gave the taped interview, he signed a plea agreement.

R.E. Doc. 26 at 15. Junior testified that, as a part of the agreement, he agreed to plea no contest to the charges in exchange for maximum sentence exposure of 18 months, and possibly no prison time at all. R.E. Doc. 26 at 16. In exchange, Junior promised to provide truthful information about what he knew to the prosecutor and to testify truthfully. If the State believed that he testified falsely or provided false information, he would suffer revocation of the agreement, retraction

9

of criminal immunity for crimes he may have committed other than those mentioned above, and be subject to perjury charges.  R.E. Doc. 26 at 15.

During cross-examination, Junior also admitted that in 2001, due to his precarious financial state, he asked several acquaintances for loans.  One individual gave him $40,000, which Junior failed to repay.  R.E. Doc. 26 at 15. He admitted that when he received the $10,000 check from Appellant on May 31, 2001, it was a loan to pay off Junior's tax debts and had no relation to the Pensacola Soccer Complex.  R.E. Doc. 26 at 19.

When impeaching Junior's testimony with prior inconsistent statements, Appellant's counsel

> cross-examined Mr. Junior about when he first revealed to investigators [Appellant]'s alleged statement during the incident that [Appellant] was "sick and tired of not being able to get three votes":
>
> Q. And what [Appellant] said was, that he said
> something like, words to the effect of, "I'm sick and tired
> of not being able to get three votes on the commission";
> right?
> A. That's correct.
> Q. Now you had been asked repeatedly over a period of
> seven months about the May 31st check in, I believe,
> nine separate sworn statements or depositions, and you
> never ever said that those words were spoken until
> January of 2003; is that correct?
> A. That's correct.
> . . . .
> Q. Right. But you never told anyone about it until

10

January of 2003; correct?

A. I'm not certain about that.

Q. Okay. Now, I could give you every single one of these depositions and you can start reading them–

A. (Interposing) No, I don't have to read them . . . .

Q. And you stated that in January of '03 at the State Attorney's Office to Mr. Cotton, the investigator; correct?

A. I think I stated it before then also.

Q. To whom?

A. To Mr. Cotton.

. . . .

Q. Tell me where. Give me a year when you said that.

A. I'm remembering having made that statement more than one time. I just can't come up with a specific time frame.

Q. Do you acknowledge that for seven months in all of your depositions and testimony, you never said it, though?

A. If that's what it states, I'll accept that.

. . . .

Q. Now, this three-vote issue, you've just told us here, you've told the jury, that when that came up was on May 31st of '01, the day of that check, right, May 31st of '01?

A. Yes.

Q. But at other times, you have said that the three-vote issue came up when the 100/100 was written down on a piece of paper, that that's when it came up, not at the May 31st meeting; is that right?

A. I'm not certain.

Q. Okay. Well, did you tell Allen Cotton on January 17th of this year that the three-vote issue came up at the time that [Appellant] wrote the 100,0000/100,000 on the piece of paper, and that's when it was?

A. I'm not certain.

Q. But if you told him that on January 17th, you would've been mistaken, because what you're saying

now is it came up on May 31st; correct?

A. I'm not certain.

Q. You're not certain as to when it came up?

A. As to when I might've told Allen Cotton.

Q. In other words, if you told Allen Cotton on January 17, '03 that it came up not on May 31st, but at the time of the 100/100, that would've been incorrect, or you don't know if that would've been incorrect?

A. Don't know.

Q. Okay. So you don't know when it came up?

A. I don't know when I talked to Allen Cotton about it.

Q. Well, I'm telling you that it was January 17th. My question is, were you telling him the truth then or were you mistaken?

A. I'm not certain.

Q. And, again, on January 31st when you met with Mr. Cotton again, did you tell him again that it was at the time of the 100/100, not at the time of the May 31st loan that the three-vote issue came up?

A. As I said earlier, I'm not certain.

Q. Under oath in June and under oath on numerous depositions and under all your prior testimony under oath prior to January of this year, though, you never, said–I asked you about Cotton, but under oath, you've never said anything about this three-vote issue, had you?

A. I can't–all of those times I did the deposition, I'm not certain.

R.E. Doc. 26 at 19-22 (citations omitted) (first & second ellipses in original).

Appellant's counsel impeached Junior's testimony with his prior inconsistent statements on other issues as well, as recited by the district court opinion:

Mr. Junior testified earlier in [Appellant]'s trial that the County's

12

purchase of the Soccer Complex was not a good idea, and [Appellant's] counsel impeached him with his prior statements that the purchase was a good idea, as well as the inconsistent reasons he gave for his opinion.

Additionally, Mr. Junior testified earlier in [Appellant]'s trial that the "100/100" note incident occurred between August and September of 2001, and [Appellant's] counsel impeached Mr. Junior with his grand jury testimony that the note incident occurred between October 4 and November 1, 2001, as well as his prior statement to [Appellant's] counsel that the note incident occurred in July or August of 2001, and his statement to Investigator Robbie Hughes that the note incident occurred after the closing on the Soccer Complex property. Mr. Junior eventually reverted back to his grand jury testimony that the note incident occurred after he put the appraisal issue on the Commission's agenda on October 4, 2001.

Mr. Junior also testified earlier in [Appellant]'s trial that when [Appellant] wrote "100,000/ 100,000" on a legal pad, [Appellant] stated he and Mr. Junior would each receive "a hundred," and [Appellant's] counsel impeached Mr. Junior with his prior deposition testimony and prior testimony in court proceedings in December of 2002 (the Elliott trial) that there was no talk when the note was written. Additionally, [Appellant's] counsel cross-examined Mr. Junior about the fact that he stated during a deposition just two weeks prior to [Appellant]'s trial that he did not know about the Soccer Complex at the time the "100/100" note was written, but at [Appellant]'s trial he testified he was aware of the Soccer Complex issue at the time the note was written. Mr. Junior also conceded on cross-examination that he said different things at different times about what happened to the "100/100" note after [Appellant] wrote it.

Additionally, [Appellant's] counsel cross-examined Mr. Junior about his testimony regarding the physical description of the pot that he received from [Appellant], and impeached him with prior inconsistent statements about this subject, including Mr. Junior's testimony during a court proceeding in December of 2002 (the Elliott trial). [Appellant's] counsel further cross-examined Mr. Junior about the date [Appellant] gave him the pot. Mr. Junior testified earlier in [Appellant]'s trial that he received the pot on November 24, 2001, but

he admitted on cross-examination that he told an investigator on June 13, 2002 that he received the pot the week before Christmas, he also admitted that he told the grand jury that he received it in early December, and then Mr. Junior explained how he arrived at the November 24 date. [Appellant's] counsel also cross-examined Mr. Junior about his earlier testimony that when [Appellant] presented him with the pot, he said "I got 25–25 out." [Appellant's] counsel asked:

Q. And isn't it true that for the first time, two months ago, . . . on January 17th, of '03, after ten prior sworn statements, you told Investigator Cotton for the State Attorney's Office that there was conversation when you got the pot; is that true?

A. That's true, and I'd like to give an explanation.

. . . .

A. And I had stated there was no discussion or no conversation, so therefore, it was just–it was not, to me, a conversation, it was just a statement made.

Q. Okay. So what you're saying is, tell the jury, I just want to make sure, that for one, two, three, four, five, six, seven, eight, nine separate sworn statements, when you said that there was no talk, nothing was said, that what you really meant was, "Well, I didn't say anything, but [Appellant] did, and he said, "'I took $25,000 out'"?

A. He made the statement, that's correct.

Q. So in those nine statements, when all the lawyers and prosecutors and judges and investigators were saying was anything said by [Appellant], by you, by anyone, and you said no, you really meant yes?

A. At that time, I was not remembering, and then I remembered that that was the statement that was made, because their thing was, was there a discussion, and to me a statement and a discussion is two different things.

. . . .

Q. And for all of those nine statements, whenever anyone asked, was anything said at that time, you figured

14

nobody was interested in whether or not [Appellant] said anything to you, when he supposedly gave you this pot filled with cash?

A. That's correct.

. . . .

After further questioning, Mr. Junior testified that "it just didn't register" that he should tell the prosecutor or investigators that [Appellant] made a statement to him when [Appellant] gave him the pot of cash. . . .

. . . .

[Appellant's] counsel again questioned Mr. Junior about his revelation of new facts less than three months prior to [Appellant]'s trial:

Q. On January 17, 2003, this year in other words, when you told Investigator Allen Cotton for the first time that [Appellant] told you that he took $25,000 out of the money pot before he gave it to you, isn't it true that Investigator Cotton asked you why all of a sudden are you telling me this now?

A. I don't know if he asked me the question about why am I telling him that now, but I had gone back and talked to my attorneys and they said whatever the truth was, tell it, and then that's what I told Allen Cotton.

Q. In other words, in January of '03 your attorneys said, whatever the truth is tell it?

A. Yes.

Q. Did you need legal advice to know that?

A. It was not legal advice. He was my lawyer and that's what his statement was.

Q. Okay. And then after Mr. Cotton said that to you, you couldn't give him an answer, correct?

A. I'm not sure.

Q. Yesterday, in other words, he was saying, how come you never said before about the $25,000 and you said, oh, well, because no one ever asked and it was always

they said about a conversation, not about a statement that was made.

But when Allen Cotton on January 17th asked you specifically the same question that I did in court yesterday, how come you never said it before, you couldn't give him an answer?

A. Well, if I didn't give him an answer, I didn't give him an answer.

Q. You just shrugged your shoulders, right?

A. I'm not certain.

. . . .

Q. And when you told Mr. Cotton on the same date, January 17th of this year, that when [Appellant] supposedly wrote the 100/100 note, he also said, "If the deal goes through on the soccer complex, it is $100,000 for you and $100,000 for me."

Mr. Cotton again asked you, "Why did it take you so long to come up with this memory of what happened?" That's a quote. And you said–and you couldn't even give him a reason. Is that true?

A. That's true.

R.E. Doc. 26 at 22-26 (citations omitted) (first & second ellipses in original).

This testimony demonstrates Junior's confusing and inconsistent statements. The court, however, prohibited Appellant's attorney from attacking Junior's credibility with the Notice of Revocation or the Elliot acquittal by linking them to Junior's motivations for changing his testimony. On April 10, 2003, the jury found Appellant guilty of one count each of bribery and of unlawful compensation or reward for official behavior, and found him not guilty on the money laundering charge. The court sentenced him to 42 months of incarceration.

16

## C. Appellant's Appeals in Florida State Courts

Appellant appealed his conviction to the Florida District Court of Appeal, claiming, *inter alia*, that the trial court abused its discretion when it denied him his Sixth Amendment right to cross-examine Junior to fully expose his biases or motives to be truthful. While failing to address Appellant's Sixth Amendment claim, the District Court of Appeal reasoned that the Notice of Revocation was more prejudicial than probative and that verdicts were generally inadmissible, and thus held that the trial court did not err in excluding the Notice of Revocation or the Elliot verdict.[2]

The Florida District Court of Appeal held that the trial court erred in finding the Notice of Revocation irrelevant, recognizing that "the State's [Notice] could have forced Junior to believe it was in his best interest to testify consistently with his latest and most detailed version of events." R.E. Doc. 8 Ex. M at 16; *see* R.E. Doc. 8 Ex. M at 14. Nevertheless, the court affirmed the trial court's exclusion of the Notice, finding that the Notice's admission would necessitate admission of the trial court's quashing of the Notice and determined, under Fla. Stat. § 90.403, that the Notice's probative value did not outweigh the prejudice it would cause the

_____

[2] Before the panel of the Florida District Court of Appeal issued its opinion, which would have reversed the lower court, the full appellate court took the unusual step of removing the case from the appellate panel and hearing it en banc. The en banc per curiam decision was accompanied by nine concurrences and dissents. R.E. Doc. 8 Ex. M (*Childers v. State*, 936 So. 2d 585 (Fla. Dist. Ct. App. 2006) (en banc) (per curiam)).

State and, oddly, Appellant.[3]  The court also affirmed on the grounds that the jury already knew that the State could revoke Junior's plea agreement if he did not testify truthfully and that Appellant had ample opportunity to cross-examine Junior on the details of his plea agreement.  R.E. Doc. 8 Ex. M at 18.  With respect to the Elliott verdict, the court merely affirmed the trial court, stating that "[v]erdicts from other cases are generally inadmissible."[4]  R.E. Doc. 8 Ex. M at 22 (citation omitted).  In sum, the Florida District Court of Appeal provided only state law justifications for limiting Appellant's cross examination of Junior and did not address the constitutionality of the cross-examination restrictions.

Appellant moved the District Court of Appeal for reconsideration, which it denied in another en banc per curiam opinion.  R.E. Doc. 8 Ex. P (*Childers v. State*, 936 So. 2d 619 (Fla. Dist. Ct. App. 2006) (en banc) (per curiam)).  This opinion had five separate concurrences and dissents.  On July 14, 2006, Appellant filed notice to invoke the discretionary jurisdiction of the Florida Supreme Court.

---

[3] R.E. Doc. 8 Ex. M at 16-18, 20 ("The admission of the notice would have been similar to admitting an opinion by the State concerning Junior's character, truthfulness, and credibility."), 21 ("[T]he type of testimony sought to be introduced . . . was likely to distract the jury during their deliberations; improperly influence the jury's evaluation of Junior's veracity, where the credibility of his testimony was a central issue; and prejudice the State's case with unreliable evidence.").

[4] The Florida District Court of Appeal excluded the verdict although Appellant was not offering the verdict to prove or disprove Elliot's guilt but rather to show the effect of the verdict on Junior's state of mind – that is, on his motivation for changing his story.

The Florida Supreme Court declined. *Childers v. State*, 939 So. 2d 1057 (Fla. 2006).

**D. Appellant's Federal Habeas Petition**

On December 14, 2006, Appellant filed a habeas petition with the United States District Court for the Southern District of Florida, which was transferred to the Northern District of Florida on May 31, 2007. Appellant claimed that the state trial court violated his Sixth Amendment right under the Confrontation Clause when it limited his cross-examination of Junior solely to avoid "unfair prejudice" to the State. R.E. Doc. 26 at 10. In her report and recommendation of July 24, 2008, the magistrate judge, conducting a *de novo* review of Appellant's Confrontation Clause claim, found that the state trial court did not violate Appellant's Sixth Amendment rights. The magistrate judge noted that to constitute a Confrontation Clause violation, the excluded testimony must have given the jury a different impression of Junior's credibility, and concluded that the excluded testimony in Appellant's trial would not have had such an effect. R.E. Doc. 26 at 32 (*Childers v. Floyd*, No. 3:07-CV-243, 2008 U.S. Dist. LEXIS 56455, at *61 (N.D. Fla. July 24, 2008)). Specifically, the judge determined that Appellant had sufficient opportunity to reveal Junior's testimonial inconsistencies and the nature of Junior's plea bargain. R.E. Doc. 26 at 31-32. The court did not

19

address Appellant's claim that avoiding prejudice to the state could not be the sole basis for limiting his rights under the Confrontation Clause. Over Appellant's objections, the district court adopted the report and recommendation in full on September 19, 2008. *Childers v. Floyd*, No. 3:07-CV-243, 2008 U.S. Dist. LEXIS 70839 (N.D. Fla. Sept. 19, 2008).

Appellant sought and was denied a certificate of appealability from the district court. On October 15, 2008, he filed for a certificate of appealability from this Court, which the Court granted six weeks later, with respect to one issue: "Whether the district court erred in finding that Childer's [sic] right to confrontation was not unconstitutionally curtailed." R.E. Tab 10 at 1 (*Childers v. Floyd*, No. 08-15590 (11th Cir. Dec. 30, 2008) (order granting certificate of appealability)). This court has jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

## II. Standard of Review

The Court reviews a district court's denial of a petition for a writ of habeas corpus *de novo* and its findings of fact for clear error. *Dingle v. Sec'y for the Dep't of Corrs.*, 480 F.3d 1092, 1098 (11th Cir. 2007). A federal court will grant a habeas petition from an individual in state custody for a claim that was adjudicated on the merits only if the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Clearly established" in paragraph (1) "refers to the holdings, as opposed to the dicta" of Supreme Court jurisprudence at the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quotation marks omitted). A state court decision is "contrary to" clearly established federal law if a state court "applies a rule that contradicts the governing law" as enunciated by the Supreme Court or if the state court "confronts a set of facts that are materially indistinguishable" from a Supreme Court decision and nevertheless arrives at a different result. *Id.* at 74 (quotation marks & citation omitted); *accord Dingle*, 480 F.3d at 1098. Paragraph (2) allows federal courts to grant a writ in cases where a state court "identifies the correct governing legal principle" from controlling Supreme Court decisions, but applies that principle to the facts of the case in an "objectively unreasonable" manner.[5] *Lockyer*, 538 U.S. at 75 (quotation marks omitted & citation); *see Dingle*, 480 F.3d at 1098.

---

[5] When evaluating state court decisions, this court grants the state court's factual findings a presumption of correctness, unless the Appellant shows by clear and convincing evidence that the record does not support the state court's determinations. *See Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001).

21

When a constitutional claim is properly presented to the state court, but the state court does not adjudicate it on the merits, we do not defer to the state court decision and must review the claim *de novo*. *Cone v. Bell*, 552 U.S. –, 129 S. Ct. 1769, 1784 (2009). In this case, no state court adjudicated the federal constitutional claim that Appellant's rights under the Sixth Amendment's Confrontation Clause had been violated. Thus, our review of this claim is *de novo*, and AEDPA deference does not apply.[6]

## III. Discussion

---

[6] The dissent argues that we are not giving the state court the deference it is due under AEDPA. In the dissent's view, the Florida District Court of Appeal effectively ruled on the Confrontation Clause claim when it discussed the Florida rules of evidence and, thus, we owe its decision AEDPA deference. We disagree. The Florida District Court of Appeal never analyzed Appellant's Confrontation Clause claim – namely, that cross-examining Junior about the Elliot verdict and the Notice of Revocation would have provided the jury with a different impression of Junior's credibility or bias. Instead, the Florida District Court of Appeal analyzed the admissibility of the Notice and the verdict only under the Florida rules of evidence, which are not coterminous with the Confrontation Clause such that a ruling based on the Florida rules of evidence is, *ipso facto*, a ruling on the Confrontation Clause. Because the state court did not address the Sixth Amendment claim, AEDPA deference does not apply. *Cone v. Bell*, 129 S. Ct. at 1784; 28 U.S.C. § 2254(d). Indeed, even if we only have "grave doubts" that the state court addressed the federal constitutional issue in question, we must review the merits of the claim *de novo*. *Wright v. Sec'y for the Dep't of Corrs.*, 278 F.3d 1245, 1254 (11th Cir. 2002); *Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001).

We note, however, that even if we were applying AEDPA deference, the state trial court's ruling would nevertheless be "contrary to, or [] an unreasonable application of, clearly established Federal law," as discussed further in the text above. *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (holding that the trial court violated Confrontation Clause when it prohibited defendant from cross-examining State's witness about possibility that State's dismissal of witness's criminal charge would bias his testimony); *Davis v. Alaska*, 415 U.S. 308, 311 nn.1-2, 318 (1974) (holding that the trial court violated Confrontation Clause by limiting defendant's cross-examination of State's witness about how fear or concern for his probation status may have affected his testimony).

22

The Sixth Amendment's Confrontation Clause mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Through the Fourteenth Amendment, this "bedrock procedural guarantee" applies to state prosecutions. *Crawford v. Washington*, 541 U.S. 36, 42 (2004). The clause aims "to ensure the reliability of evidence" through the use of various procedural safeguards. *Id.* at 61; *see Maryland v. Craig*, 497 U.S. 836, 845 (1990). "It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61; *accord Craig*, 497 U.S. at 845-46 ("[T]he right guaranteed by the Confrontation Clause . . . forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth . . . .") (quotation marks & citations omitted). Cross-examination serves not only to reveal a witness's perceptions and memory but also to expose his "biases, prejudices, or ulterior motives." *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *accord Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986).

A Confrontation Clause violation arises when a criminal defendant is unable "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Van Arsdall*, 475 U.S. at 680

(quoting *Davis*, 415 U.S. at 318).[7]  Conversely, a court usually satisfies the

mandate of the Confrontation Clause when the accused receives "a *full* and fair

opportunity to probe and expose [testimonial] infirmities [such as forgetfulness,

confusion, or evasion] through cross-examination, thereby calling to the attention

of the factfinder the reasons for giving scant weight to the witness' testimony."

*Craig*, 497 U.S. at 847 (quoting *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985)

(per curiam)) (brackets in original) (quotation marks omitted) (emphasis added).

If a Confrontation Clause violation has occurred, reversal is mandated on

collateral review when the error "had substantial and injurious effect or influence

in determining the jury's verdict."  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)

(quotation marks & citation omitted); *Brecht v. Abrahamson*, 507 U.S. 619, 623

(1993).  This analysis depends on several factors, including "the importance of the

witness' testimony in the prosecution's case, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the

testimony of the witness on material points, the extent of cross-examination

otherwise permitted, and, of course, the overall strength of the prosecution's case."

---

[7] The error depends on whether the excluded testimony would have provided the jury with a different impression of a witness's credibility – not on whether the testimony would have altered the trial's outcome.  *Van Arsdall*, 475 U.S. at 680; *accord Davis*, 415 U.S. at 318.

*Van Arsdall*, 475 U.S. at 684.[8]

In accordance with Supreme Court precedent, this court has long recognized that while a trial court's evidentiary ruling "is entitled to a great deal of deference," this discretion is narrower (due to constitutional concerns) where the court limits a defendant's right to cross-examine witnesses against him. *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992) (citing *United States v. Beale*, 921 F.2d 1412, 1424 (11th Cir. 1991)); *accord United States v. Crumley*, 565 F.2d 945, 949 (5th Cir. 1978) ("A trial court's sound discretion limits the scope and extent of cross-examination and an appellate court will only interfere with that ruling if it finds an abuse of discretion. However, *this discretion must give due regard to the Sixth Amendment's right of confrontation*." (emphasis added) (citing *United States v. Mayer*, 556 F.2d 245 (5th Cir. 1977); *United States v. Brown*, 546 F.2d 166 (5th Cir. 1977))).[9] We emphasize "'the particular importance of searching cross-examination of witnesses who have substantial

---

[8] If the court finds itself in equipoise as to whether a Confrontation Clause violation had a substantial and injurious effect or influence in determining the jury's verdict, it must grant habeas relief. *California v. Roy*, 519 U.S. 2, 5 (1996); *O'Neal*, 513 U.S. at 436 ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win.").

[9] The Eleventh Circuit in *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

incentive to cooperate with the prosecution,'" *Lankford*, 955 F.2d at 1548 (quoting *Jenkins v. Wainwright*, 763 F.2d 1390, 1392 (11th Cir. 1985)), because "'[a] desire [by a witness] to cooperate may be formed beneath the conscious level, in a manner not apparent even to the witness, but [that] such a subtle desire to assist the state nevertheless may cloud perception.'" *Id.* (quoting *Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir. 1981)). This heightened need for full cross-examination to unearth possible bias also arises "where the witness sought to be cross-examined is the government's 'star' witness, providing an essential link in the prosecution's case." *Id.* (quoting *Greene*, 634 F.2d at 275 (citing *United States v. Summers*, 598 F.2d 450, 460 (5th Cir. 1979))) (quotation marks omitted).

**A. The Confrontation Clause Violation**

Appellant claims that his rights under the Confrontation Clause were violated when the trial court curtailed his attempt to expose Junior's motive by cross-examining Junior about the Elliott acquittal and the Notice of Revocation. Appellant Br. 17, 20. We agree. Although the state trial court allowed Appellant to unearth inconsistencies in Junior's testimony and reveal the conditions of Junior's plea bargain during cross-examination, *see, e.g.*, R.E. Doc. 26 at 13-28; Appellee Br. 15-17 (quoting Trial Tr.), its failure to permit cross-examination of Junior's <u>motive</u> for changing his testimony deprived Appellant of a "full . . .

26

opportunity to probe and expose" Junior's "testimonial infirmities." *Craig*, 497 U.S. at 847 (brackets omitted). Specifically, the court severely limited Appellant's ability to probe Junior's motivations for changing the crux of his testimony – a core element of Confrontation Clause rights, and one the court has a heightened duty to protect due to Junior's role as the State's star witness and as a witness with substantial incentives to aid the prosecution. *See Davis*, 415 U.S. at 316. In sum, the trial court allowed Appellant to explore <u>how</u> Junior's testimony changed, but not the reasons <u>why</u> the new version advanced by Junior after Elliot's acquittal may have been fabricated.[10]

By preventing Appellant from examining Junior's perceptions of how the Elliott acquittal affected his plea bargain, the trial court impermissibly stripped the relevant context from the change in Junior's testimony from which the jury could assess Junior's motivations. *See Davis*, 415 U.S. at 319; *see also Craig*, 497 U.S. at 847. Specifically, Junior, having attested to the same facts seven prior times, added specific, inculpatory details to his narrative <u>only after</u> his testimony failed to secure a conviction in the Elliott trial. Appellant sought to question Junior about his perceptions of his role in the failure of the Elliott prosecution and to discover

---

[10] Contrary to the assertions of the dissent, we do not address Rule 403 of the Florida Rules of Evidence, Fla. Stat. § 90.403. We merely hold that, <u>in the unique circumstances of this case</u>, the state trial court transgressed the discretionary limits imposed by the Confrontation Clause through this particular application of Florida Rule 403.

27

any consequent pressure that Junior felt to alter his story to ensure Appellant's conviction and thereby save his plea bargain. Without having to confront this line of questioning, Junior was able to portray the inconsistencies in his statements as products of memory lapses and forgetfulness. *See, e.g.*, R.E. Doc. 26 at 16-26. Although Junior's purported inability to recall events consistently eroded his credibility, had Appellant been able to elicit Junior's reaction to the Elliot acquittal, the jury may have further discounted Junior as a witness. Conversely, the State presents no evidence that permitting the narrow use of the Elliott acquittal for these purposes would have led to, *inter alia*, "harassment, prejudice, confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. Further, the court could have addressed any lingering concerns about the role of the Elliott acquittal in the jury's deliberations with a well-tailored limiting instruction.

The trial court also violated Appellant's Confrontation Clause rights by not permitting Appellant to cross-examine Junior about how the Notice of Revocation, and the court's quashing of the Notice, affected Junior's state of mind. Whether alone or in the context of the Elliott acquittal, the Notice and its quashing could have seriously undermined Junior's already fragile credibility by exposing his ulterior motives for altering his testimony. First, excluding the Notice improperly

28

bolstered Junior's testimony. After learning about the contents and conditions of the plea agreement and hearing nothing about an attempted revocation, the jury may have concluded falsely that the prosecution believed Junior's revised testimony to comport materially with his prior statements. Similarly, the jury could have concluded that Junior felt obligated to testify truthfully because the prosecutor could revoke the plea deal at will. *See, e.g.*, Trial Tr. 669:1-20, 1171:7-1172:3, 1175:11-22. On the other hand, discussion of the court's denial of the Notice would have shown the jury that the prosecution no longer exercised such leverage against Junior, *see, e.g.*, Trial Tr. 685:9-17, and thereby may have eroded the jury's faith in Junior's testimony. With knowledge that the prosecution had already failed once to exercise its purported sole discretion to revoke Junior's plea agreement, the jury may have had little reason to believe that the prosecution retained the power to revoke the agreement if Junior testified untruthfully.

Second, despite the court's order denying revocation of the plea bargain, Junior reasonably may have believed that if he again modified his testimony, even if only back to his original version, the prosecution again would attempt to revoke his plea bargain. Junior may have felt compelled to testify in accordance with his new story when confronted with 125 years in prison, irrespective of its truthfulness. The trial court's evidentiary rulings erroneously prevented Appellant

29

from presenting these otherwise hidden motivations to the jury. *See Craig*, 497 U.S. at 845-46; *Van Arsdall*, 475 U.S. at 680. Finally, to the degree that discussion of the Notice of Revocation during cross-examination would have exposed the prosecution's lack of faith in the truthfulness of its "star" witness, the exclusion of such usually inadmissible evidence should have yielded to the State's paramount interest in protecting a criminal defendant's Confrontation Clause rights. *See Davis*, 415 U.S. at 319. Again, the trial court could have diminished any unfair prejudice to the State through a limiting instruction to the jury.

In sum, the trial court's restrictions of Junior's cross-examination substantively frustrated Appellant's attempts to expose Junior's potential motivations for altering his prior testimony to further implicate Appellant. These motivations and their effect on the jury's perception of Junior's credibility lie at the heart of Appellant's right to be confronted with the witnesses against him. *See Van Arsdall*, 475 U.S. at 678-79; *Davis*, 415 U.S. at 317-18; *see also id.* at 316 ("The partiality of a witness is subject to exploration at trial, and is always relevant as discrediting the witness and affecting the weight of his testimony.") (quotation marks & citation omitted). The district court accurately found as a factual matter that Appellant exposed Junior's testimonial inconsistencies and somewhat damaged his credibility. But that fact alone does not indicate that the

state trial court permitted Appellant to exercise his Confrontation Clause rights. Exposing Junior's motivations as a product of his desire to preserve his plea agreement, which lowered his potential custodial sentence from 125 years to 18 months, rather than as ambiguous (though probably disingenuous) memory lapses undoubtably would have given the jury a different impression of his credibility. *See Van Arsdall*, 475 U.S. at 679 ("By . . . cutting off all questioning about an event . . . that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated [Appellant]'s rights secured by the Confrontation Clause."), 680.

## B. Whether the Error Was Harmless

Turning to the relevant factors as set forth in *Van Arsdall*,[11] we note that Junior served as the prosecution's "star" witness and was the sole person to give eye witness testimony about Appellant's criminal behavior. This circumstance makes a vigorous cross-examination central to the defense's case. The permitted cross-examination of Junior at trial failed to elicit crucial potential motives underlying Junior's testimony and, in that respect, was inadequate – and not

---

[11] As noted earlier, the factors are "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

cumulative. A thorough examination of the full case record also reveals little, if any, corroborating or contradicting evidence that sheds light on the validity of Junior's testimony. The record demonstrates that Junior's credibility was somewhat damaged after the jury learned of his testimonial inconsistencies and his wavering, evasive explanations for them. However, it is reasonable to infer that had Appellant been able to cross-examine Junior fully about the Notice of Revocation and Elliot's verdict, Junior's credibility could have been completely eviscerated. While this case presents a close issue, this court finds the violations had substantial and injurious effect and influence in determining the jury's verdict. *See Roy*, 519 U.S. at 5; *O'Neal*, 513 U.S. at 436.

## IV. Conclusion

For the reasons stated above, the court REVERSED the district court's decision and REMANDS this case to the district court with instructions to grant Appellant's petition for a writ of habeas corpus.

**REVERSED**.

32

BARKETT, Circuit Judge, concurring:

I concur in Judge Barzilay's opinion. The dissent claims that Appellant's federal Sixth Amendment claim was adjudicated in the state courts and therefore we owe AEDPA deference to the state court's decision. However, the state courts did not adjudicate Appellant's claim that his rights under the Confrontation Clause had been violated. The state court instead exclusively relied on Florida rules of evidence to justify the exclusion of the Notice of Revocation and the Elliot acquittal. Thus, as Judge Barzilay explains, our review is *de novo* and AEDPA deference does not apply. *Cone v. Bell*, 129 S.Ct. at 1784 (2009).

The dissent appears to suggest that evidence which is properly excludable under Fla. Stat. § 90.403 can never violate the Confrontation Clause, under <u>any</u> set of circumstances. As a threshold matter, this argument was never made by the state, either in this court or any other, and is not properly before this court. In any case, Fla. Stat. § 90.403 asks courts to determine whether relevant evidence is otherwise inadmissible because its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." Although some of these questions might be interrelated to a Confrontation Clause claim, there is an independent inquiry under the Confrontation Clause, which requires that defendants be

33

"permitted to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318.

Moreover, there is no claim here that the evidence would mislead the jury, confuse the issues, or be cumulative. The only rationale given by the state courts for the exclusion is that the admission of the evidence would prejudice the State. But this prejudice consists simply of attacking the credibility of the State's star witness, a prejudice which is actually one of the defendant's rights protected by the U.S. Constitution and our adversarial system. *See, e.g., United States v. Chandler*, 326 F.3d 210, 223 (3d Cir. 2003) (holding that, despite the government's valid interest in keeping misleading information from the jury, limiting cross-examination as to witness's motive for testifying against the defendant violated the Confrontation Clause).

TJOFLAT, Circuit Judge, dissenting:

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218–19 (1996), amended provisions

of 28 U.S.C. § 2254. As amended, § 2254 prohibits a federal court from granting

a writ of habeas corpus with respect to a claim that was adjudicated on the merits

in a state proceeding unless the adjudication

> (1) resulted in a decision that was contrary to, or involved
> an unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d).

The First District Court of Appeal of Florida, in affirming the convictions of

Wyon Dale Childers, rejected Childers's claim that the trial court abused its

discretion in precluding him from impeaching Willie J. Junior with two pieces of

evidence that, according to Childers, would have exposed Junior's bias or motive

to be untruthful: (1) the State Attorney's attempted revocation of the State's

sentencing recommendation in Junior's plea agreement by filing a Notice of

Revocation of Terms of Plea Agreement, and (2) the not guilty verdict the jury

returned at the trial of Joseph Franklin Elliott. The District Court of Appeal

35

rejected Childers's claim under Fla. Stat. § 90.403 because the probative value of such evidence was outweighed by the prejudice it would have caused if presented to the jury. Childers contends that the District Court of Appeal's decision denied him his Sixth Amendment right of confrontation and requires the vacation of his convictions. This court agrees and directs the district court to issue a writ of habeas corpus. I respectfully dissent.

I dissent because the court, in granting the writ, ignores the commands of AEDPA and Supreme Court precedent, Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060 (1989), and Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000). That is, instead of determining whether the District Court of Appeal's § 90.403 ruling is "contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), in effect at the time of the ruling, as required by Teague and Williams, the court disregards AEDPA, Teague and Williams, and adjudicates Childers's Confrontation Clause claim as if AEDPA and those decisions were nonexistent. In part I, I demonstrate that under AEDPA, Teague, and Williams, Childers is not entitled to federal habeas relief because the District Court of Appeal applied § 90.403 in a manner that was not contrary to clearly established federal law. In part II, I show how this court's decision runs afoul of the clear mandates of AEDPA, Teague, and Williams and, moreover, casts

36

a pall over the review of Federal Rule of Evidence 403 rulings in the cross-examination context in this circuit.

I.

A.

On April 30, 2002, an Escambia County grand jury returned separate indictments against Willie J. Junior, Joseph Franklin Elliott, and Georgann Elliott.[1] Junior, a member of the Board of Commissioners of Escambia County (the "Commission") for the previous seventeen years, was charged with bribery (four counts), extortion (four counts), racketeering, and grand theft. Joseph Elliott was charged with bribery, racketeering, and money laundering, and Georgann Elliott was charged with conspiracy to commit bribery, principal to bribery, and money laundering.

On June 14, 2002, Junior, still a member of the Commission but under suspension, met with investigators from the State Attorney's Office. Three days later, on June 17, Junior entered into a plea agreement with the State Attorney, which called for him to plead <u>nolo contendere</u> to all charges in exchange for the

---

[1] The indictments were returned to the Escambia County Circuit Court. Escambia County and Okaloosa County are part of the First Judicial Circuit of Florida. According to the case docket sheets, on motion for change of venue, the Elliotts' cases were transferred to and tried in Okaloosa County.

State Attorney's recommendation at sentencing that the court sentence him to a term of incarceration of not more than eighteen months. The plea agreement required Junior to "testify truthfully in any and all criminal prosecutions against any and all defendants in which he is called to testify by the State." In the event of his "refusal to cooperate" or his provision of "statements or testimony that are incomplete or untruthful," the District Attorney could revoke the plea agreement with respect to his sentencing recommendation,[2] meaning that Junior would be subject to maximum statutory penalties totaling 125 years.

The same day Junior and the State Attorney entered into this plea agreement, an Escambia County grand jury indicted Wyon Dale Childers for bribery, extortion, racketeering, grand theft, money laundering, and unlawful compensation or reward for official behavior. At the time, Childers was in the second year of his six-year term on the Commission.

On September 17, 2002, Junior pled nolo contendere to the charges lodged against him, and thereafter testified for the State in the other cases. The trial of Georgann Elliot took place first, on November 4, 2002. It ended in a mistrial after the six-person jury deadlocked three to three. Joseph Elliott went to trial on

_____

[2] If the State Attorney revoked the agreement, Junior's nolo contendere pleas would remain undisturbed.

December 2, 2002, and the jury acquitted him. Childers's trial began on March 31, 2003, and lasted nine days. The jury found him guilty on the bribery and unlawful compensation charges, and acquitted him of the remaining charges.

The charges in Childers's case, as in the others, were rooted in Escambia County's purchase of the Pensacola Soccer Complex from Joseph Elliott. According to the State, Childers offered Junior $40,000 for his vote in favor of the purchase; Childers would pay Junior from the kickbacks they would receive from Joseph Elliott after the deal closed.

Junior testified for the State at the Elliott trials. Childers's counsel, having observed those trials, knew that Junior would be the State's key witness against their client and that his credibility would be crucial to the State's case. To attack his credibility, counsel armed themselves with the transcripts of the testimony Junior had previously given under oath. In addition to testifying at the Elliott trials, he had been examined under oath, and at length, on some eight occasions—before the Escambia County grand jury and at pretrial depositions taken by counsel representing the Elliotts and Childers. Childers's attorneys also had the substance of statements Junior had made State Attorney investigator Allen Cotton on January 17 and 31, 2003, several weeks after Joseph Elliott's acquittal. Those statements differed from statements he previously had made. Specifically,

39

while he earlier testified that Childers presented him with a note that said "100/100" on it (referring to the amount of money to be exchanged) without any conversation, he told Cotton that Childers told him, while passing the note, that "if the soccer complex goes through, it will be a hundred for you and a hundred for me." Junior had also testified that the note passing occurred after the Commissioners voted to appraise the value of the soccer complex, but before they voted to purchase it. He told Cotton that Childers passed him the note before the vote on the appraisal. Lastly, while he had previously maintained that Childers had given him a money-filled cooking pot without comment, he revised this to say that Childers told him that Childers had removed different amounts of cash from the pot.

As a result of Junior's January 17 and 31 disclosures, the State Attorney filed a Notice of Revocation of Terms of Plea Agreement (the "Notice of Revocation") on February 4, 2003, notifying Junior, and the court, that the State would revoke the State's sentencing recommendation for failing to comply with the terms of the plea agreement. Junior's nolo contendere pleas would remain in full effect, but he would be subject to the 125-year statutory maximum (if the court imposed consecutive sentences for the offenses to which he had pled nolo contendere) rather than a total sentence of up to eighteen months, as the plea

agreement recommended.

On March 13, 2003, the court held a hearing on the State Attorney's Notice of Revocation. An Assistant State Attorney argued that the information Junior gave Cotton on January 17 and 31 constituted "new statements, new testimony, new evidence that he had never before provided." Junior "wait[ed] seven months . . . [and gave] eight different sworn testimonies" before providing the State Attorney's Office with "the information that he gave . . . on January 17th and January 31st. . . . [T]hat is substantial noncompliance."

The court disagreed, with this statement:

[T]he written plea agreement states that Mr. Junior was to testify truthfully and completely, a subjective test at best. The statements he made on January the 17th and 31st with State Attorney investigators, even if materially different from other statements and information previously given, were not under oath at a trial or hearing, and it does not indicate anything other than his willingness to assist the State in accordance with the plea agreement.

Finally, the State in their written response and yesterday during oral argument, re: response to W.D. Childers' motion to exclude the testimony of Willie Junior, acquiesced that Mr. Junior has consistently maintained and testified to certain material evidence.

In conclusion, the Court finds that there has been substantial compliance with the written plea agreement, and for that reason the State is without basis . . . to revoke it. Therefore, the State's Notice of Revocation of Terms of Plea Agreement is set aside.

41

On March 20, 2003, the State filed six motions in limine.[3]  Relevant here is the State's third motion, designed to exclude any "mentioning, arguing, or introducing" evidence of Joseph Elliott's acquittal during Childers's cross-examination of Junior.  The State contended that the verdict was irrelevant, and that even assuming its relevance, the acquittal would be "more prejudicial than probative."  In a response filed on March 27, Childers argued that the not guilty verdict was highly relevant to his attempt to impeach Junior's credibility as the State's star witness, based on Junior's prior inconsistent statements.[4]

The court scheduled a hearing on the motion for March 31.  On the morning of the hearing, Childers, assuming that he could bring the Notice of Revocation to the jury's attention in cross-examining Junior, moved the court in limine to prevent the State from asking Junior, on redirect, what the court's response was to the Notice of Revocation and then introducing the court's ruling verbatim.

At the hearing, the court first addressed the State's motion.  The State argued that evidence of Elliott's acquittal, whether introduced during Junior's cross-examination or as an exhibit, would be highly prejudicial and, at best, only

---

[3]  On March 28, 2003, the State filed two more motions in limine not relevant here.

[4]  I have difficulty understanding what Childers's counsel meant.  Perhaps he meant that Junior's prior statements—which implicated Childers and Elliott (and himself) in a kickback plot—were inconsistent with the jury's verdict of acquittal.  In acquitting Elliott, the jury was effectively rejecting as not credible Junior's prior statements.

minimally relevant. Childers, responding, argued that the acquittal was relevant to show Junior's "state of mind" when he met with Inspector Cotton on January 17 and 31, implying that Junior thought that he had to alter his version of some of the critical events to ensure that the jury convicted Childers and, thus, compliance with his plea agreement. Childers contended that the Confrontation Clause, U.S. Const. art. VI, and Hair v. State, 428 So. 2d 760, 761–63 (Fla. 3d Dist. Ct. App. 1983), entitled him to cross-examine Junior about the acquittal. The court agreed with the State and ruled that evidence of the Elliott acquittal would be excluded at trial, finding that if the acquittal were introduced, the "prejudice" it would cause "would outweigh any probative value" the evidence might have.[5]

Having disposed of the State's motion in limine, the court turned to the in limine motion Childers had filed to preclude the State from countering his cross-examination of Junior about the Notice of Revocation by introducing the court's ruling that the State could not revoke the sentencing recommendation it made in the plea agreement.[6] The court informed Childers that, if he wanted to cross-

---

[5] The court said nothing about Childers's Confrontation Clause argument.

[6] As noted, in filing his motion in limine, Childers assumed that the Confrontation Clause and Florida law gave him the right to cross-examine Junior about the Notice of Revocation. Toward the end of the March 31 hearing, he made the constitutional basis of his assumption clear to the court.

examine Junior about the Notice of Revocation, the State would be permitted to inform the jury of the court's ruling. Childers rejected the court's offer. The court returned to the issue later in the hearing, stating that both the Notice of Revocation and the court's rejection thereof were irrelevant and thus inadmissible.

Childers's trial began on April 1, 2003. In cross-examining Junior, Childers did not renew his effort to get the acquittal or Notice of Revocation before the jury. As this court points out in its opinion, however, Childers cross-examined Junior extensively, questioning him for approximately ten hours. Maj. Op. at 9. This court also observes that Childers "elicited the details of Junior's plea agreement and impeached Junior's testimony with prior inconsistent statements." Id. Despite this withering cross-examination, the jury credited Junior's testimony, finding Childers guilty of bribery and unlawful compensation or reward for official behavior.

Childers moved for a new trial on April 17, 2003, arguing that the court's rulings excluding evidence of the Elliott acquittal and the Notice of Revocation constituted denials of his right of confrontation. On May 16, 2003, the court denied the motion and sentenced Childers to concurrent prison terms of forty-two months. Childers thereafter appealed his convictions to the First District Court of Appeal.

B.

In his brief to the District Court of Appeal, Childers presented one issue: whether the trial court "abused its discretion when it denied [Childers] his Sixth Amendment constitutional right to fully cross-examine [the] key prosecution witness to expose his bias or motive to be untruthful." In the argument section of his brief, as set out in the margin below, Childers contended that the trial court's denial of his right of cross-examination also infringed his rights under the Florida Constitution, Fla. Const. art I, § 16, Fla. Stat. § 90.608, and Florida case law.[7] The denial occurred when the court ruled that he could not cross-examine Junior about the State Attorney's Notice of Revocation and the Elliott acquittal. That verdict, he contended, was the reason why Junior went to the State Attorney's office on January 17 and 31, 2003, with a further, and more incriminating, explanation of his dealings with Childers.

---

[7] Childers argued that in Florida, "a defendant in a criminal case has considerable latitude in cross-examination to elicit testimony showing the bias of prosecution witnesses," Shaw v. State, 831 So. 2d 772, 774 (Fla. 4th Dist. Ct. App. 2002) (citing Fla. Stat. § 90.608 ("Any party . . . may attack the credibility of a witness by . . . [s]howing that the witness is biased.")); that Florida's "evidence code liberally permits the introduction of evidence to show the bias or motive of a witness," Gibson v. State, 661 So. 2d 288, 291 (Fla. 1995); and that "'Section 90.608(2), Florida Statutes, as well as the Sixth Amendment to the United States Constitution, guarantee a defendant 'the right to a full and fair opportunity to cross-examine prosecution witnesses in order to show their bias or motive to be untruthful,'" Shaw, 831 So. 2d at 774 (quoting Barows v. State, 805 So. 2d 120, 122 (Fla. 4th Dist. Ct. App. 2002)).

The District Court of Appeal declined to address Childers's Confrontation Clause argument, although it adjudicated the facts on which the argument relied, and affirmed his convictions after concluding that the trial court had excluded the Notice of Revocation and the Elliott acquittal in conformance with the Florida law of evidence. Childers v. State, 936 So. 2d 585, 592–96 (Fla. 1st Dist. Ct. App. 2006) (en banc) (per curiam). The court rejected Childers's Notice of Revocation argument under Fla. Stat. § 90.403, Florida's counterpart to Federal Rule of Evidence 403.[8] Section 90.403 ("Florida 403"), "Exclusion on grounds of prejudice or confusion," states: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." The District Court of Appeal held that the probative value of the Notice of Revocation line of questioning was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.[9] Addressing the "probative

---

[8] Fed. R. Evid. 403, "Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time," states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The criteria for excluding evidence under Fla. Stat. § 90.403 and the federal rule are substantially the same, except that the latter also permits the exclusion of evidence if the probative value is outweighed by "undue delay [or] waste of time."

[9] As indicated in the text supra, the trial court, after ruling that if Childers cross-examined Junior about the Notice of Revocation, the State could introduce the court's rejection

46

value" side of the Florida 403 scale, the court said this:

> First, the evidentiary impact of the notice was reduced substantially when the trial court ruled that Junior had complied with the plea agreement and denied the attempted revocation. Certainly, as the trial court stated when ruling on the inadmissibility of the notice of revocation, if the notice to revoke were admitted into evidence, the trial court's order denying the motion would be allowed into evidence as well.

> . . . .

> [Moreover,] the evidence in question actually had little probative value in [Childers's] defense, as its admission would have resulted in the jury hearing that the trial court had found Junior to be in compliance with his agreement to testify "truthfully." This, no doubt, explains why [Childers] attempted to exclude the trial court's ruling. . . . [Further,] the evidence which [Childers] attempted to admit here involved another proceeding, Junior's criminal case. As was the case with the evidence in Marchina [v. State, 702 So. 2d 1369 (Fla. 1st Dist. Ct. App. 1997)], here the limited probative value of the State's Notice to Revoke was far outweighed by unfair prejudice to [Childers] himself and the State.

> Second, from the testimony of both Investigator Cotton and Junior, the jury learned that the State could revoke Junior's plea agreement if he did not testify truthfully. Thus, the notice would serve merely to emphasize facts already in evidence.

> Finally, [Childers's] counsel vigorously and extensively cross-examined Junior on his plea agreement and the State's right to revoke the agreement if Junior failed to testify truthfully.

---

of the Notice (a proposition Childers would not accept), held that both the Notice of Revocation and the court's rejection of the Notice were irrelevant. The District Court of Appeal disagreed; both pieces of evidence were relevant. The court affirmed the trial court's ruling on another ground, an application of § 90.403, which it was permitted to do under state law. Home Depot U.S.A. Co. v. Taylor, 676 So. 2d 479, 480 (Fla. 5th Dist. Ct. App. 1996).

[Moreover,] defense counsel ably demonstrated to the jury that Junior had changed his testimony by January 2003.

Childers, 936 So. 2d at 593–94.[10]

The court then quoted from the trial transcript several excerpts of Junior's cross-examination. It ended its discussion of the probative value of the Notice of Revocation with this finding:

> Thus, the jury was well aware of the plea agreement, the State's ability to revoke it, and Junior's motivation to cooperate created by the threat of revocation. The introduction of the notice to revoke and the order denying the motion would have added little of probative value to what the jury had before it.

Id. at 595.

Next, the court weighed the factors on the "danger" side of the Florida 403 scale, which counseled the exclusion of the Notice of Revocation, with these statements:

> [T]he introduction of the notice to revoke would have been highly prejudicial. The admission of the notice would have been similar to admitting an opinion by the State concerning Junior's character, truthfulness, and credibility. Such opinion testimony regarding a witness' reputation for truthfulness is clearly inadmissible. See Antone v. State, 382 So. 2d 1205, 1213–14 (Fla. 1980) (holding improper a question of a witness which sought "to elicit the

---

[10] As this language of the court's opinion and the language that follows this footnote indicate, the court read Childers's Notice of Revocation argument this way: Childers had a right to cross-examine Junior about the Notice and at the same time prevent the State from bringing out the fact that the court had rejected the Notice on the ground that Junior had complied with the terms of the plea agreement.

individual and personal view of the witness."); Hernandez v. State, 575 So. 2d 1321, 1322 (Fla. 4th DCA 1991) (holding that it was reversible error to admit testimony of police officers and teacher that sexual abuse victim was truthful. "A witness invades the jury's exclusive province when that witness gives his or her personal views of the credibility of another witness."); Alvarado v. State, 521 So. 2d 180, 181 (Fla. 3d DCA 1988) (holding that an opinion of a witness concerning his or her belief as to the truthfulness of another witness "was clearly inadmissible."); Morrison v. State, 818 So. 2d 432, 451 (Fla. 2002) (holding that it was improper to allow personal opinion to establish reputation for truthfulness without laying a foundation based on knowledge of the witness' reputation in community for truthfulness); Wyatt v. State, 578 So. 2d 811, 813 (Fla. 3d DCA 1991) (holding that section 90.405, Florida Statutes, does not permit opinion testimony regarding evidence of character); Ehrhardt, Florida Evidence § 405.2 at 258 ("Opinion testimony concerning a person's character has traditionally been inadmissible on the basis that it is too unreliable; it will be tainted by the underlying prejudice and bias of the person expressing the opinion.") (footnote omitted). In our view, the type of testimony sought to be introduced by [Childers] was likely to distract the jury during their deliberations; improperly influence the jury's evaluation of Junior's veracity, where the credibility of his testimony was a central issue; and prejudice the State's case with unreliable evidence. Because the prejudice to the State that would be created by the admission of the notice to revoke substantially outweighs the very limited probative value of this evidence, the notice was excludable under section 90.403, Florida Statutes.

Id. at 595–96.

Having disposed of the argument regarding the Notice of Revocation, the District Court of Appeal turned to the argument that the trial court abused its discretion in denying Childers the right to cross-examine Junior about his state of mind following Joseph Elliott's acquittal. The court summarily rejected the

49

argument with a statement that, under Florida law, "[v]erdicts from other cases are generally inadmissible." Id. at 596 (citing Secada v. Weinstein, 563 So. 2d 172, 173–74 (Fla. 3d Dist. Ct. App. 1990)). Since the court was reviewing the trial court's ruling under the abuse of discretion standard, the court was effectively holding that the trial court had not abused its discretion in excluding evidence of the Elliott verdict.

## C.

After the Florida Supreme Court denied review, Childers petitioned the district court, pursuant to 28 U.S.C. § 2254, for a writ of habeas corpus. His case was referred to a magistrate judge, who issued a report and recommendation recommending the denial of Childers's petition. The report and recommendation did not address the facts the District Court of Appeal found in concluding that the trial court had not abused its discretion in denying Childers the right to cross-examine Junior with the Notice of Revocation and the Joseph Elliott verdict; rather, it reasoned that since Childers was able to extensively cross-examine and impeach Junior without asking him about the Notice or the verdict, Childers's Confrontation Clause rights were not denied. The district court adopted the magistrate's report and recommendation verbatim and denied Childers a writ of habeas corpus. Childers then appealed to this court. On December 30, 2008, we

issued a certificate of appealability on one issue: "Whether the district court erred in finding that Childer's [sic] right to confrontation was not unconstitutionally curtailed?"

D.

Section 2254, as amended by AEDPA, bars a federal court from granting a writ of habeas corpus on a claim that was adjudicated on the merits in a state proceeding unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In this case, Childers does not contend that the District Court of Appeal's decision was based on an unreasonable determination of the facts underpinning its ruling; hence, our only concern is whether the decision was "contrary to . . . clearly established Federal law, as determined by the Supreme Court."[11] Id.

---

[11] "A state-court decision will . . . be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." Williams, 529 U.S. at 405, 120 S. Ct. at 1519. This can occur in two ways:

First, a state-court decision is contrary to [the Supreme] Court's precedent if the state

51

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," id., "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision," Williams, 529 U.S. at 412, 120 S. Ct. at 1523. Williams stemmed from the Court's decision in Teague, which held that the Court would not recognize a new rule of constitutional law on collateral review. Teague, 489 U.S. at 310, 109 S. Ct. at 1075. The necessary implication of Teague is that habeas petitioners would henceforth need a clearly established Supreme Court holding on which to base their challenges to state court rulings.

Furthermore, habeas practice, whether before or after AEDPA, has demanded that the federal courts afford a presumption of correctness to the facts the state court found in reaching its decision. 28 U.S.C. § 2254(e)(1) (2006) (post-AEDPA statute); 28 U.S.C. § 2254(d) (1994) (pre-AEDPA statute); Blankenship v. Hall, 542 F.3d 1253, 1271–72 (11th Cir. 2008). Here, as discussed in part I.B., supra, the District Court of Appeal made findings of fact regarding the probative

court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law. Second, a state-court decision is also contrary to [the Supreme] Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's].

Id. Childers does not contend that this case involves the second way.

52

value versus the prejudicial effect of the evidence at issue, and struck the balance in favor of excluding the evidence. We must defer to those findings and presume that the District Court of Appeal correctly found that the probative value of the evidence was outweighed by its likely prejudicial effect.

The question then becomes what Supreme Court precedent was clearly established when the District Court of Appeal upheld the trial court's exclusion of Childers's evidence. This court cites the only case of which I am aware that squarely addresses the extent to which a trial court may, without running afoul of the Confrontation Clause, limit the scope of a defendant's cross-examination: Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431 (1986). After stating that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," id. at 678, 106 S. Ct. at 1435 (internal quotation omitted), the Van Arsdall Court said this about a rule akin to the one the District Court of Appeal invoked here:

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an

opportunity for effective cross-examination, not cross-examination
that is effective in whatever way, and to whatever extent, the defense
might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292,
295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original).

Id. at 679, 106 S. Ct. at 1435 (first two emphases added).

Here, the District Court of Appeal relied on the clearly established rule of

evidence the Supreme Court approved in Van Arsdall.[12]  The language of Federal

Rule of Evidence 403 ("Federal 403") that Van Arsdall summarized—"prejudice,

confusion of the issues, the witness' safety, or interrogation that is repetitive or

only marginally relevant"—is of the same effect as the nearly identical language of

Florida 403.  The Seventh Circuit, in a § 2254 case, equated the Van Arsdall

language I underscored above with that of Federal 403 and a similar Wisconsin

evidentiary rule in deciding whether a Wisconsin murder conviction should be set

aside on the ground that the petitioner was denied the constitutional right to

confrontation in cross-examining a witness.  The court said this:

> Applicable precedents, particularly Delaware v. Van Arsdall, 475
> U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), and Davis v.
> Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), say
> that the defendant is entitled to cross-examine a witness about
> potential sources of bias, but that the trial judge may place limits on

---

[12]  The fact that the District Court of Appeal did not cite Van Arsdall does not change the
analysis.  Compliance with the "contrary to" language of AEDPA "does not require citation of
[the Supreme Court's] cases—indeed, it does not even require awareness of [those] cases, so
long as neither the reasoning nor the result of the state-court decision contradicts them." Early v.
Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (per curiam).

the examination to prevent what the rules of evidence call "the danger of unfair prejudice, confusion of the issues, or misleading the jury". Fed. R. Evid. 403.

Lindh v. Murphy, 124 F.3d 899, 901 (7th Cir. 1997).

In light of Van Arsdall's language and the Seventh Circuit's expression in Lindh, it is clear that the Confrontation Clause in the cross-examination context does not preclude the operation of Florida 403 as written or the Florida practice of committing Florida 403 rulings to the trial judge's discretion. The same is true with respect to Federal 403. In other words, there is nothing about the Rule or its application through the exercise of trial court discretion that offends the constitutional right of confrontation.

A trial court abuses its discretion in admitting or excluding evidence if it bases its ruling on facts that are clearly erroneous or on an incorrect view of the law.[13] If an appellate court reverses a conviction because the trial court abused its discretion in admitting or excluding evidence on cross-examination or via another witness, the reversal is due to the trial court's reliance on clearly erroneous facts or

---

[13] "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." McGregor v. Bd. of Comm'rs of Palm Beach County, 956 F.2d 1017, 1022 (11th Cir. 1992) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 2461 (1990)). This is the traditional statement of the abuse of discretion standard. I know of no case law, and can conceive of none, stating that the standard is different when applied to an evidentiary ruling at trial. See, e.g., United States v. Duran, 596 F.3d 1283, 1296 (11th Cir. 2010) ("We review evidentiary rulings for an abuse of discretion.").

the misapplication of the governing rule of law, not on a violation of the defendant's right of confrontation. Thus, if the trial court's exclusion of evidence in such context does not constitute an abuse of discretion, I submit that the Confrontation Clause does not come into play. That is, I am unaware of any federal court of appeals holding that the exclusion of relevant, probative evidence on cross-examination, although not an abuse of discretion under Federal 403, nonetheless constituted a violation of the Confrontation Clause. In the cross-examination context, for a court to find no abuse of discretion in the application of Federal 403 but in the same breath find a Confrontation Clause violation, the court would have to say that the Confrontation Clause had rendered inoperative one or more of the Federal 403 criteria on the "danger" side of the scale.

In summary, the District Court of Appeal decided Childers's claim after independently finding the facts material to a Florida 403 ruling. That resolution was entirely consistent with the law the Supreme Court had clearly established in Van Arsdall, permitting trial judges to exercise discretion to limit the scope of cross-examination. Because the state court did not decide Childers's claim in a manner contrary to clearly established federal law, Childers's Confrontation Clause claim fails.

E.

56

Let's suppose, however, that we should review the District Court of Appeal's decision as if we were reviewing Childers's conviction as a federal conviction on direct appeal. That is, instead of determining whether the decision was contrary to clearly established federal law, in force at the time, we determine whether the decision is contrary to our interpretation of the Confrontation Clause at this very moment.[14] What we would have before us, then, is a Federal 403 ruling, like the one the District Court of Appeal issued, excluding the two pieces of evidence at issue here. I start with the Notice of Revocation—with Childers's argument that he should have been able to refer to it in cross-examining Junior.[15]

The Notice was signed by the State Attorney and an Assistant State Attorney. They had apparently been involved in the case from the outset. The Notice they signed stated that "Mr. Junior's prior statements, deposition testimony and trial testimony are contrary to his January 17, 2003 and/or January 31, 2003 statements indicating he has provided incomplete and/or untruthful answers on previous occasions." Junior gave these January statements to Cotton. The Notice

---

[14] This is, I submit, the approach the court has taken today in granting Childers habeas relief.

[15] Childers's counsel would not have agreed with the trial court that if they cross-examined Junior with the Notice, the State could introduce the court's rejection of the Notice. In my view, it would have been suicide for the jury to learn that the judge presiding over the trial had declared, in refusing to enforce the Notice, that Junior had substantially complied with the plea agreement, meaning that he had been truthful.

therefore constituted the opinion of two of the State's prosecutors that Junior, in light of what he told Cotton, had testified untruthfully on previous occasions.

The prosecutors' opinions would not be admissible unless they took the witness stand. Under Federal Rule of Evidence 608(a) they could do that, see United States v. Lollar, 606 F.2d 587, 588–89 (5th Cir. 1979),[16] provided a sufficient foundation was established. United States v. Dotson, 799 F.2d 189, 192 (5th Cir. 1986). Childers apparently eschewed that approach, deciding instead to get the opinion before the jury in cross-examining Junior. On cross-examination, he would try to get Junior to say that he agreed with the prosecutors' assessment of his truthfulness. Childers's problem was that the State would get before the jury the fact that the trial judge had rejected the State Attorney's Notice. Childers did not want to run this risk, so the court barred him from asking Junior about the Notice.

On direct appeal, we would find no abuse of discretion in the trial court's handling of the matter. In balancing the probative value of the Notice and the trial judge's order against the danger of unfair prejudice, we might place the same factors on the "probative value" and "danger" sides of the scale as the District

---

[16] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Court of Appeal did. As it opined, the probative value (of the Notice and the trial court's order) would be this:

> the evidence in question . . . had little probative value . . . as its admission would have resulted in the jury hearing that the trial court had found Junior to be in compliance with his agreement to testify "truthfully." This, no doubt, explains why [Childers] attempted to exclude the trial court's ruling.

Childers, 936 So. 2d at 594.

In addition, in performing this balancing, the trial court would have to consider the following. If the Notice of Revocation were introduced, and the jury learned that the State Attorney's Office thought that Junior's previous statements under oath were untruthful, Childers might be able to persuade the jury in closing argument that the State, in putting Junior on the stand, had suborned perjury. To counter this possibility, the State Attorney and his assistant would have had to testify. Or, it may be that the trial judge would have been asked to testify, to assure the jury that Junior had been truthful. This scenario's potential for unfair prejudice, confusion of the issues, or misleading the jury would weigh heavily in the court's decision to preclude Childers's use of the Notice in cross-examining Junior—let alone the delay that would ensue if, in examining the prosecutors or the trial judge, the lawyers delved into the eight occasions that Junior had been examined under oath prior to the first Elliott trial. In sum, even if we were

reviewing Childers's convictions as federal convictions on direct appeal, we would find no abuse of discretion in the trial court's handling of the Notice issue.

I turn now to the Joseph Elliott acquittal. Childers claimed that the acquittal had a bearing on Junior's state of mind; he had to change his testimony to avoid the possibility that the State would revoke the sentencing recommendation it made in the plea agreement. In other words, Junior realized that his testimony at Joseph Elliott's trial failed to persuade the jury to convict; he had to embellish it.

The District Court of Appeal affirmed the exclusion of the Joseph Elliott verdict because "[v]erdicts from other cases are generally inadmissible." Childers, 936 So. 2d at 596. The court cited a Third District Court of Appeal decision, Secada v. Weinstein, 563 So. 2d 172, 173–74 (Fla. 3d Dist. Ct. App. 1990). Childers, 936 So. 2d at 596. The introduction of a prior verdict into evidence "has the inevitable tendency of causing the jury in the present case to defer to [the] decision[] made in [the] previous one and thus to delegate the uniquely non-delegable duty of reaching its own independent conclusions." Secada, 563 So. 2d at 173. In other words, learning that the jury had acquitted Joseph Elliott in his case on essentially the same evidence presented in Childers's case might tempt Childers's jury to acquit Childers. Another problem with admitting the Joseph Elliott verdict is that it is unclear whether it represents a determination that (1)

60

there was a reasonable doubt as to whether Joseph Elliott committed any of the crimes charged; (2) he committed none of the crimes charged; or (3) he was guilty of one or more of the crimes, but jury nullification occurred. Although the verdict may have been relevant to Junior's state of mind when he visited Cotton at the State Attorney's Office on January 17 and 31, 2003, and thus admissible to that extent, the inappropriate effect the verdict could have had on the jury would have justified the trial court's discretionary exclusion of the evidence under Federal 403 on balance.

In sum, in the direct appeal of Childers's federal court conviction, I would hold that the trial court's evidentiary rulings at issue did not constitute an abuse of discretion. Implicit in that holding would be a holding that a denial of cross-examination in violation of the Confrontation Clause could not have occurred. And if, on direct appeal, we would not disturb the trial court's rulings, how is it that we should disturb the District Court of Appeal's rulings given the limitation AEDPA places on our review?

II.

In this part, I first address, in subpart A, the approach this court takes in determining whether Childers made out a Confrontation Clause claim. I conclude that it is not in keeping with the approach mandated by AEDPA. Next, in subpart

61

B, I point out the negative effects today's decision will have, in this circuit, on the state courts' adjudication of a claim like the one presented here and on this court's adjudication of such a claim.

A.

Under AEDPA, where the facts underlying the petitioner's constitutional claim are fully litigated in the state courts and the district court does not hold an evidentiary hearing, our appellate review of the district court's decision granting or denying habeas relief is, actually, a review of the highest state court's adjudication of the claim. In the case at hand, the district court did not hold an evidentiary hearing. Our review, therefore, should be of the District Court of Appeal's decision adjudicating Childers's claim that the trial court erred in excluding the two pieces of evidence I have been discussing. That the district court failed to explicitly determine whether the District Court of Appeal's adjudication of Childers's claim was contrary to clearly established federal law does not alter our task: we are to determine whether the District Court of Appeal's decision was contrary to clearly established federal law. This the court has not done; it makes no attempt to resolve the constitutional issue cited in the certificate of appealability by relying on a Supreme Court rule clearly established and in effect at the time the District Court of Appeal acted, as Teague and Williams

62

require.

The court states that we are reviewing the district court's decision denying habeas relief. This is true as a matter of form, but not of substance.[17] The court also states that we are reviewing the state court's decision de novo. Maj. Op. at 22. It is not entirely clear to me whether the court is reviewing the state trial court's rulings or those of the District Court of Appeal. Properly, we should be reviewing the District Court of Appeal's decision. And AEDPA requires that we accord that court's findings the presumption of correctness, meaning that we do not review the findings de novo.[18] Lastly, there is no indication in the majority opinion that the court determined explicitly whether the District Court of Appeal's adjudication was contrary to clearly established federal law extant at the time of

---

[17] For example, the court states that we are reviewing the district court's findings of fact for clear error. Maj. Op. at 20. The district court made no findings of fact because it did not hold an evidentiary hearing. The district court's task, like ours here, was to look to the facts found by the District Court of Appeal. Those facts are entitled to a presumption of correctness. The district court did not do that; nor does this court here.

[18] The majority opinion pays lip service to the presumption of correctness owed state court's findings of fact, Maj. Op. at 21 n.5, but it fails to discuss the facts the District Court of Appeal actually found, as I recounted in part I.B. Even after attempting to address this point by positing that "the Florida District Court of Appeal analyzed the admissibility of the Notice and the verdict only under the Florida rules of evidence, which are not coterminous with the Confrontation Clause," Maj. Op. at 22 n.6, the court still engages in virtually no analysis of the factfinding performed by the District Court of Appeal. I submit that were it to do so, it would reach this ineluctable conclusion: the District Court of Appeal's finding that the prejudicial effect of the Notice outweighed its probative value was not contrary to clearly established federal law as stated in Van Arsdall. Consequently, Childers's Confrontation Clause rights suffered no violation.

63

that adjudication, again as Teague and Williams require.

B.

Equally troubling to me is the effect the court's decision will have in this circuit on the state courts' adjudications of a claim like the one presented here and on this court's adjudication of such a claim on the direct appeal of a criminal conviction. The court's approach works mischief by effectively instructing the state courts that they must explicitly address the federal claim, or else have a federal court issue a writ of habeas on the basis of law not in existence when the state court acted. This is wrong for several reasons. First, it flies in the face of Williams's mandate that "clearly established Federal law" refers only to Supreme Court holdings in effect at "the time of the relevant state-court decision." 529 U.S. at 412, 120 S. Ct. at 1523. Second, and more importantly, it undermines the goals of comity and deference to state court decision making that Congress had in mind when it enacted AEDPA. See Williams v. Taylor, 529 U.S. 420, 436, 120 S. Ct. 1479, 1490 (2000); Newland v. Hall, 527 F.3d 1162, 1183 (11th Cir. 2008). The court's argument, essentially, is that Childers's Confrontation Clause claim went undecided by the District Court of Appeal; it is still outstanding, and the federal courts must decide it afresh on collateral review. But that is not what the District Court of Appeal did. Instead, as I have explained, it invoked state

64

evidentiary rules, the application of which subsumed Childers's Confrontation Clause argument. The District Court of Appeal would have reversed Childers's conviction had it found that the trial court abused its discretion in excluding Childers's two pieces of evidence under Florida 403, not because the court violated the Confrontation Clause. It found no such abuse of discretion; indeed, it found as a factual matter that the trial court correctly decided that Childers's evidence was more prejudicial than probative. AEDPA requires that we defer to this state court decision, supported as it was by the facts, but this court does not afford such deference.

Instead, faced with what it erroneously thinks is an undecided federal claim, the court improperly proceeds to review de novo the District Court of Appeal's decision. Maj. Op. at 22; see Cone v. Bell, ___ U.S. ___, 129 S. Ct. 1769, 1784 (2009). Instead, this case calls for the straightforward application of § 2254(d). Here, no Supreme Court precedent would have informed the District Court of Appeal that it would be denying Childers's constitutional right of confrontation if it weighed the probative value of the Notice of Revocation and the Elliott acquittal against the danger of undue prejudice to the State, distracting the jury during their deliberations, and improperly influencing the jury's evaluation of Junior's veracity and then, in the exercise of its discretion, held the evidence inadmissible. Van

65

Arsdall was the only applicable Supreme Court precedent for the District Court of Appeal to follow, and nothing suggests that the District Court of Appeal's decision was contrary to it.

III.

For the foregoing reasons, I dissent.