[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-13408

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 08, 2007
THOMAS K. KAHN
CLERK

D.C. Docket No. 99-01466 CV-ASG

RICHARD ALLEN DINGLE,

Petitioner-Appellant,

versus

SECRETARY FOR THE DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 8, 2007)**

Before EDMONDSON, Chief Judge, BARKETT and COX, Circuit Judges.

COX, Circuit Judge:

Richard Allen Dingle appeals the denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. His petition is grounded on an ineffective-assistance-of-counsel claim. The district court denied relief. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

In November of 1991, Dingle was caring for his girlfriend's eight-month old daughter for several hours. During that time, the baby became flaccid and listless. Dingle admits he picked up the child and patted her on her back three to five times. When she continued to choke, he put the child on her back on the bed and blew into her mouth and nose until food came up through her mouth and nose. He testified that the baby was not crying and not moving. Dingle said that he never shook the baby, but that when he was holding her under her armpits and patting her on her back to revive her, her head was bouncing a little because she was flimsy. But her head did not move enough to "pop" anything. He said that he did not hit her too hard, but he did pat her with light strikes or a tapping motion. When the baby was still choking and not breathing, Dingle called 911. The baby was taken to the hospital and died.

Dingle was arrested, gave a voluntary statement to the police, and was charged with first-degree murder and aggravated child abuse.[1] Because the baby had never

---

[1] Dingle gave a voluntary, lengthy statement to the police in which he told the police the following. The baby had not had any eating or coughing problems the morning he took care of her. Additionally, although she had no visible symptoms, according to her mother she had a cold.

At some point during the time he took care of her, he fed the baby. She sat up while eating, and had no problems eating or swallowing. After he finished feeding her, he went in the other room to retrieve a towel with which to clean the baby. When he returned, she was lying on her back with a mouthful of food and appeared to have difficulty breathing. So, he picked her up and lightly patted her on the back a few times. As he did this, her head moved in a slight whipping motion. Some food became dislodged as he patted her on the back, but she continued to gasp for air as if she were choking. Dingle told the police that he then laid her on her back, held her nose, and blew into her mouth at least four times, but probably more, in an effort to give her mouth-to-mouth resuscitation.

been alone with Dingle other than the few hours on the day of her death, the timing of her injuries was a crucial issue at trial. Attorney Scott Sakin was appointed to represent Dingle.

At Dingle's trial, the State presented three experts to support its theory that Dingle inflicted the fatal injuries, but the court denied Sakin's request for the appointment of two additional expert witnesses, leaving Sakin with only two experts. The experts who testified on Dingle's behalf were Dr. Wayne Ross, a chief pathologist for three counties in Pennsylvania, but not board certified in neuropathology or clinical pathology, and Dr. Raul Vila, the deputy chief medical examiner of Broward County who is board certified in forensic pathology. The additional experts that Sakin requested be appointed were Dr. Joe Burton, the chief forensic pathologist in Atlanta, and Dr. Rhonda Kessler, a pediatric radiologist.

Drs. Roger Mittleman, Michael Tidwell, and Ronald Kim testified for the State. Dr. Mittleman, a county medical examiner, testified that his autopsy showed massive bruising on her lower back and buttocks, with fresh, massive hemorrhaging indicative of recent very prominent trauma, lower spinal column and spinal cord injury, and a

---

As he was doing this, her stomach was going up and down and food was coming out of her nose and mouth, but he did not notice her arms or legs moving and she was not crying. After about ten minutes of attempting to help her, she was still not breathing correctly. So, he called emergency services. The emergency services personnel arrived in about five minutes. He never shook her.

fractured sacrum at the lower end of the spinal column. He believed that the injuries to the lower back and buttocks showed that a great deal of force must have been applied to these areas to cause such injuries, and these injuries were inconsistent with the child accidentally falling off the bed. Instead, the injuries would have been caused by punching, kicking, or pressing extremely hard. Because he found blood clots and hemorrhages in various locations of the baby's brain, Dr. Mittleman suspected shaken baby syndrome, but also said that if trauma to the spinal cord is sufficient, it can travel upward into the brain. The blood on the brain was fresh and consistent with having occurred in one incident. Further, Mittleman believed that the fact that the child ate the morning she was with Dingle showed that she was not then suffering from any brain injury. Additionally, he testified that her injuries were consistent with being slammed down and her head snapping back, causing the spinal cord to be compressed. He agreed with the defense experts that the child had a wrist fracture that could have been one to two weeks old when she died, but also believed that the injury to her spinal cord could not have taken place any earlier than when she was in Dingle's care. In short, Mittleman believed Dingle's story was inconsistent with the autopsy findings.

Dr. Tidwell, a pediatric orthopaedist, testified that a healthy infant has a very rapid healing process, including healing of fractures. That means, he said, that an

4

expert not experienced in pediatric orthopaedics might mistake new fractures as older fractures. Additionally, Dr. Tidwell testified that a sacral fracture is so painful to a child that she would not have been able to move once the fracture occurred. He said that he could tell the date of the baby's fatal injury could not have been more than five days prior to the autopsy, which corresponded with the day that Dingle was taking care of her. Dr. Tidwell had no question in his mind that all of the baby's injuries occurred at the same time.

Finally, Dr. Kim, an expert in neuropathology and anatomic pathology, testified that the child "sustained severe trauma to the buttocks region most likely [caused] by being planted very hard on a hard surface in the sitting position, so to speak, which damaged the spinal cord, produced fractures in the sacral region, produced the . . . severe bruising in the buttocks and in the genital area, [and] caused the child to stop breathing." (Trial Tr., March 4, 1994 at 791.) At the same time, her head would have snapped back, resulting in her brain hemorrhaging and swelling. Dr. Kim concluded that all the baby's injuries could have occurred at the same time from a hard blow, and only could have occurred if she fell from a great height or was forcibly planted onto her buttocks. It was Dr. Kim's opinion that the baby's fatal injuries occurred during the time she was in Dingle's care.

5

The two doctors who testified on Dingle's behalf, Drs. Ross and Vila, testified the child died as the result of shock from injuries inflicted days before Dingle was caring for her. These injuries, Vila and Ross believed, caused the child's brain to swell continuously for a period of days, eventually causing her to stop breathing.

Dr. Ross testified that the child had fractures to her buttocks that were ten to 21 days old and hemorrhaging in the same area that was minimal and consistent with CPR efforts. He also testified that her spinal cord was not affected and she died as the result of swelling of the brain due to battered child syndrome. He believed that the fracture to the baby's sacral area would have been painful at first, but she would have been able to crawl eventually. Additionally, he testified that the swelling of the brain was caused by blunt trauma to the head or shaking that occurred up to one or two days before the swelling began. Thus, he believed, the brain injury could have occurred while the baby was with Dingle or prior to that time, but did not believe the timing of this injury could be scientifically determined. Further, Dr. Ross testified that this brain injury–not the spinal injury–was the sole cause of the baby's death.

Dr. Vila testified that the fractures to the baby's left arm and thumb were ten days to two weeks old and the injuries to her sacral area were sustained prior to the day she went to the hospital. Dr. Vila believed that there were no injuries to the spinal cord, but that there were fractures to the spinal column. He concluded that

6

these injures to the spinal column were caused by blunt trauma, probably as the result of Dingle's efforts to dislodge food and resuscitate her.

The two experts that were the subject of Sakin's denied request to appoint additional experts, Drs. Kessler and Burton, both expressed the opinion that the baby had suffered injuries to the arm, wrist and sacrum that occurred before Dingle ever spent time alone with her. In fact, Dr. Kessler opined that the injuries were three to four weeks old, if not older. Thus, Dr. Kessler's testimony would have supported the conclusion that the child had been physically abused by someone other than Dingle prior to her death. Dr. Kessler further believed that the baby's preexisting injuries supported the conclusion that she had been physically abused by someone other than Dingle prior to her death. She would have testified that the baby's preexisting injuries might not have been apparent to Dingle or other laypersons, or even a trained nurse who frequently visited the child's home. Dr. Kessler disagreed with Dr. Tidwell's theory that some of the injuries were caused by intravenous lines inserted during hospitalization. Dr. Kessler would have testified that the baby's wrist fracture was at least two weeks old, but that she did not believe this injury contributed to the baby's death in any way. The district court found that Dr. Kessler could not testify as to when the child's fatal injuries occurred. However, she would have testified that these fatal injuries were brutal and showed that the child was either forcibly thrown

7

or slammed down on a hard surface or that she was drop-kicked "like a football." Dr. Kessler could not determine the time of the child's spinal injuries, but deferred to the State's experts in that matter.

At the end of the trial, the jury found Dingle guilty of both first-degree murder and aggravated child abuse. On appeal to Florida's Third District Court of Appeal, the Public Defender's office represented Dingle. Dingle argued only that the trial court erred in denying Sakin's request to appoint two additional experts. The appellate court agreed and reversed and remanded for a new trial.

At the second trial, the subject of this petition, Sakin once again represented Dingle. Sakin informed the court at a pretrial hearing that he would be calling Drs. Kessler, Ross, and Vila. Drs. Ross and Vila were expected to testify essentially as they did in the first trial. Dr. Kessler was expected to testify as we have previously described.

The State introduced expert testimony from Drs. Mittleman and Tidwell, who testified in the first trial, and Dr. Lucy Rorke, a neuropathologist at Children's Hospital of Philadelphia since 1965 and for the medical examiner's office in Philadelphia. The State also introduced the statement that Dingle gave the police.

Drs. Mittleman and Tidwell testified essentially as they did at the first trial. Neither of them had any doubt that the baby's fatal injuries occurred on the day that

she was in Dingle's care. Dr. Rorke testified that the extreme hemorrhaging in the baby's buttocks area indicated that she had suffered considerable trauma. She believed that any child with such an injury would not want to move and would cry loudly for long periods of time; a happy, playful child would be completely inconsistent with this baby's injuries. She testified that severe shaking of the baby could not have caused her injuries, but a strong blow to the buttocks could have caused the fatal trauma. It was Dr. Rorke's opinion that the baby was injured shortly before the emergency personnel were called. So, all three of the State's experts opined that the baby's fatal injuries were inflicted during the time that Dingle was with the baby.

After the State presented its evidence and rested, the defense moved for a judgment of acquittal, which the court denied. After the court denied the motion, the defense rested.

The trial court asked Sakin to explain why he was choosing to rest rather than present any defense witnesses, but Sakin responded that it was inappropriate for him to divulge his strategy before the case concluded. The court then asked Dingle whether he was knowingly and voluntarily giving up the right to call witnesses and testify. Dingle answered, "Yes. But I'm just doing exactly what my lawyer is instructing me to do." (Trial Tr., July 1, 1996 at 1606.) The court questioned him

further and Dingle eventually admitted that he understood the decision not to put on a defense case and that it was his choice to follow the advice of his attorney. Sakin then made his closing argument, asking the jury to find Dingle guilty only of the lesser-included offense of child abuse, rather than aggravated child abuse. A conviction of the lesser-included offense would have precluded a conviction of first-degree felony murder. For the second time, a jury found Dingle guilty of aggravated child abuse and first-degree murder.

Dingle again appealed to the Florida Third District Court of Appeal. That court affirmed. *Dingle v. State*, 699 So.2d 834 (Fla. 3d Dist. Ct. App. 1997). Dingle then filed a postconviction motion under Florida Rule of Criminal Procedure 3.850, in which he claimed that Sakin had been constitutionally ineffective. The trial court denied the motion and the Third District Court of Appeal affirmed the denial. *Dingle v. State*, 732 So.2d 1077 (Fla. 3d Dist. Ct. App. 1999).

Dingle then filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the federal district court, which raises a number of claims including the claim that Dingle was denied effective assistance of counsel by Sakin's failure to call expert witnesses. The magistrate judge recommended that the petition be denied because Dingle could not show that he was prejudiced by Sakin's tactical choice not to call

expert witnesses. The district court adopted the magistrate judge's report in full and denied relief. Dingle appealed to this court.

This court rejected each of Dingle's claims except his ineffective assistance claim. *Dingle v. Sec. Dept. of Corr.*, 37 Fed.Appx. 505 (11th Cir. 2002). As to that claim, this court vacated and remanded to the district court with instructions to hold an evidentiary hearing to ascertain the strategy behind Sakin's decision to proceed as he did in the second trial and to determine whether Dingle knowingly acquiesced to the strategy. *Id.*

Pursuant to the remand, there were two evidentiary hearings: one to determine Sakin's reasoning behind his trial strategy and the other to determine whether Dingle knowingly acquiesced in that strategy.

At the first evidentiary hearing, Sakin testified that he originally planned to call expert witnesses at the second trial, but the State called different witnesses in its case-in-chief, which altered Sakin's strategy. He also testified that some of the experts he planned to call were either no longer available or unable to provide helpful testimony. He insisted that his decision not to call experts in the second trial was a considered and deliberate choice.

The magistrate judge found that Sakin's decision not to present expert testimony at the second trial was a "conscious tactical decision." (R.2-91 at 31.) She

11

also concluded that Sakin's decision not to present experts was reasonable, and hence not constitutionally deficient representation. The magistrate judge determined that Drs. Kessler, Vila, and Ross were all available to testify at the second trial, but Dr. Burton was not. After determining that three experts were available to Dingle, she concluded that Dingle would have been convicted even if Sakin had presented expert testimony, because the first jury had been unconvinced by the testimony of Drs. Ross and Vila and "[a]ny advantage the defense might otherwise have gained from Dr. Kessler's observation of an older fracture of [the child's] wrist was thoroughly undermined by her deposition testimony about the probable manner in which the baby was brutalized." (R.2-91 at 37.)

The district court agreed with the magistrate judge's report in part, but remanded the case for a second evidentiary hearing in order to determine whether Dingle knowingly acquiesced in Sakin's trial strategy. Pursuant to the remand, the magistrate judge heard testimony from Dingle and issued another report. She found Dingle's testimony "implausible" and "purposely evasive." The magistrate judge concluded that Dingle knowingly acquiesced in Sakin's trial strategy and recommended that Dingle's petition be denied. The district court adopted the magistrate judge's findings and denied Dingle's habeas petition.

## II. CONTENTIONS OF THE PARTIES AND ISSUES ON APPEAL

Dingle contends that Sakin's strategy of not calling readily-available experts to testify on his behalf was so objectively unreasonable that no competent attorney would have chosen it. Dingle also argues that Sakin failed to fulfill his duty to consult with Dingle about the advantages and disadvantages of not presenting expert testimony and, instead, concede his guilt. Thus, Dingle claims, Sakin's representation was constitutionally ineffective under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

The State argues that the district court correctly denied Dingle's petition because it is clear from the record that Sakin made a reasonable tactical decision to proceed as he did. The State points out that a jury found Dingle guilty at his first trial, even with the benefit of expert testimony, and the additional expert would not have been helpful in the second trial. Thus, the State contends, it cannot be said that no competent attorney would have chosen to proceed the way Sakin did. Additionally, Dingle's position at trial was that he agreed with his attorney's strategy. Thus, the State argues, Dingle was not prejudiced by his attorney's actions and his counsel was not constitutionally ineffective.

## III. STANDARD OF REVIEW

We review the district court's denial of a petition for writ of habeas corpus de novo, and the district court's findings of fact for clear error. *Wright v. Hopper*, 169 F.3d 695, 700 (11th Cir. 1999).

## IV. DISCUSSION

Because Dingle's claim was adjudicated on the merits in state court, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") forecloses relief unless the state court's adjudication of his claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state-court decision is "contrary to" clearly established law if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or the state court confronted facts that are "materially indistinguishable" from relevant Supreme Court precedent but arrived at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000). A state-court decision is an "unreasonable application" of clearly-established law if the state court unreasonably

extends or unreasonably fails to extend a clearly established legal principle to a new context. *Williams*, 529 U.S. at 407, 120 S. Ct. at 1520.

Dingle argues that his attorney was ineffective for failing to present available expert witnesses to testify on his behalf. In order to succeed on this claim, Dingle must show both that his lawyer's actions "fell below an objective standard of reasonableness" and "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694, 104 S. Ct. at 2064, 2068. This two-pronged test requires a showing of deficient performance and prejudice as a result of that deficiency. We can evaluate either the prejudice or the performance prong first and, if either one cannot be met, Dingle's claim must fail. *Id.* at 697, 104 S. Ct. 2069.

A. THE PERFORMANCE PRONG

To satisfy the deficient performance prong of his ineffective-assistance-of-counsel claim, Dingle has the burden of proving that Sakin made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 691, 104 S. Ct. at 2066. Additionally, Dingle must overcome the strong presumption that his counsel rendered reasonable professional assistance. *Id.* at 689, 104 S. Ct. at 2065 (explaining that we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

15

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'") (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S. Ct. 158, 164 (1955). In short, considering all the circumstances, we give great deference to choices dictated by reasonable strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994); *Atkins v. Singletary*, 965 F.2d 952, 958 (11th Cir. 1992) (stating we must, "in a highly deferential manner, examine 'whether counsel's assistance was reasonable considering all the circumstances'") (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065). The question is whether some reasonable lawyer at the trial could have acted as defense counsel acted in the trial at issue and not what "most good lawyers" would have done. *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) (internal citations omitted). Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was "so patently unreasonable that no competent attorney would have chosen it." *Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983).

The state court held that Sakin made a tactical decision not to present expert testimony. This finding is a finding of fact, "and a state court's decision as to this issue is therefore presumed to be correct, absent convincing evidence to the contrary." *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995). Sakin's statements during

the state court trial and his testimony at the evidentiary hearing before the magistrate judge support the finding that Sakin's decision was a strategic one. Sakin had secured experts and these experts were available to testify on Dingle's behalf. Accordingly, it is clear that Sakin chose not to call these expert witnesses. Thus, the state court's finding that Sakin's approach in the second trial was the result of a tactical decision has support in the record and must be considered correct.

Whether Sakin's tactical decision was reasonable, and therefore within the wide range of competent professional assistance, is an issue of law. *Jackson*, 42 F.3d at 1367. Under the deferential standard of AEDPA, our review is limited to whether the state court's decision that Sakin was not ineffective is contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. A jury found Dingle guilty of both charges at his first trial, even with the benefit of expert testimony on Dingle's behalf. Given that the jury at the second trial would have heard substantially the same testimony that led to a guilty verdict in the first trial, it was not unreasonable for Sakin to attempt to shift the focus at trial from causation to Dingle's intent, an issue on which expert testimony was not available. Sakin employed a different trial strategy than he had in the first trial in the hopes of obtaining a more favorable verdict for his client. The change in focus allowed Sakin to shift attention from the brutal nature of the baby's injuries. On the

17

other hand, had Sakin called expert witnesses, the jury might have heard Dr. Kessler, one of Dingle's own witnesses, express the opinion that the child was forcibly thrown or slammed down on a hard surface, or was drop-kicked "like a football." Sakin wanted to keep the jury from hearing such testimony and, instead, keep the jury focused on intent. Although this new strategy resulted in a guilty verdict, we are not permitted to use the benefit of hindsight to conclude that Sakin should have known his new strategy would be unsuccessful.

It is simply not the case, as Dingle argues, that Sakin had "nothing to gain" by not calling expert witnesses. Instead, by not calling any witnesses to the stand, Sakin not only could focus more on intent than on causation, but he also retained the distinct advantage of presenting both the initial and concluding closing argument to the jury.[2] Fla. R. Crim. P. 3.250. Additionally, Sakin's choice allowed him to focus on the non-intentional nature of Dingle's conduct as opposed to the cause and brutality of the baby's injuries. As to Dingle's claim that Sakin failed to consult about the advantages and disadvantages of not presenting expert testimony and, instead, concede guilt, Dingle points to no evidence in the record to support a finding that Sakin failed to consult. Additionally, Sakin did not concede that Dingle killed the child, only that if the jury determined that Dingle caused the baby's death, he

---

[2] Although Sakin acknowledged that this is not the reason that he chose to proceed as he did, this is still a distinct advantage.

18

should be found guilty of the lesser offense of child abuse or manslaughter, not murder. It is true that Sakin could have presented expert testimony and still pursued this line of argument, but he retained the advantages we have discussed by not doing so.

We conclude that the state court's decision that Sakin's performance at Dingle's second trial was not so deficient that no competent attorney would have chosen to proceed as he did was neither contrary to nor involved an unreasonable application of clearly established federal law as determined by the Supreme Court.

B. THE PREJUDICE PRONG

Because Dingle has failed to establish the deficient performance prong of his *Strickland* claim, we need not address the prejudice prong. *Strickland*, 466 U.S. at 697, 104 S. Ct. 2069 (explaining a court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs).

## V. CONCLUSION

For the foregoing reasons, we find no error in the district court's conclusion that the state court's holding that Dingle did not receive ineffective assistance of counsel was not contrary to federal law. His petition for a writ of habeas corpus was properly denied.

AFFIRMED.