[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 22-13228

Non-Argument Calendar

_____

JUDE BERNADO LAHENS,

Petitioner-Appellant,

*versus*

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:19-cv-01433-RBD-EJK

_____

Before ROSENBAUM, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Jude Lahens is a Florida prisoner serving a 20-year minimum-mandatory term of imprisonment after a jury convicted him in 2010 of attempted second-degree murder (Count 1) and aggravated battery with a firearm (Count 2). He appeals the district court's denial of his *pro se* 28 U.S.C. § 2254 petition for writ of habeas corpus.[1] We granted him a certificate of appealability on the following two issues:

(1) "Did Lahen's trial counsel provide ineffective assistance, pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to introduce his pre-trial hearing testimony at trial in order to support his self-defense claim for Count 2?"

(2) "Did Lahens trial counsel provide ineffective assistance, pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to request an instruction on the justifiable use of non-deadly force related to Count 2?"

After careful review, we affirm.

---

[1] Although Lahens proceeded *pro se* in the district court, he has counsel on appeal.

## I.    Background

In 2009, the state of Florida charged Lahens with the attempted first-degree murder with a firearm of Jose Rodriguez (Count 1) and aggravated battery with a firearm of Sonny Dorelie. Prior to trial, Lahens moved to dismiss the charges based on stand-your-ground immunity under Fla. Stat. § 776.032,[2] which extends immunity from prosecution to individuals who used force to defend themselves. The trial court held an evidentiary hearing on the motion. At the hearing, numerous witnesses to the incident in

---

[2] Section 766.032 provides that "[a] person who uses or threatens to use force as permitted in s. 776.012, s. 776.013, or s. 776.031 is justified in such conduct and is immune from criminal prosecution and civil action for the use or threatened use of such force . . . ." Fla. Stat. § 766.032. At the time of Lahen's trial, § 766.012, in turn provided as follows:

> A person is justified in using force, except deadly force, against another when and to the extent that the person reasonably believes that such conduct is necessary to defend himself or herself or another against the other's imminent use of unlawful force. However, a person is justified in the use of deadly force and does not have a duty to retreat if:
>
> (1) He or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony; or
>
> (2) Under those circumstances permitted pursuant to [§] 776.013.

Fla. Stat. § 776.012 (2011).

question testified, including Lahens, his brother Berlin, and the alleged victims of the charged offenses.

Testimony at the hearing established that Lahens, his brother Berlin, Berlin's girlfriend, and some other friends went to a nightclub in downtown Orlando in February 2009 to celebrate Lahens's and another friend's birthdays. They left the club at around 2:30 a.m. Upon exiting the club, Berlin and his girlfriend walked ahead of Lahens and their group of friends toward the car.

Lahens testified that, as he was leaving, he started "[m]aking friendly conversation" with a female from another group of people in an attempt to "pick her up." At that point, a man began getting "aggressive" with Lahens and told him to leave the female alone. Once they entered the parking lot, the man punched Lahens, and a fight broke out. Lahens then observed his brother, Berlin, running towards the fight. He also observed Jose Rodriguez, who was with the female's group, running towards him. According to Lahens, Rodriguez reached Berlin first and put a gun to Berlin's face (at which point the fighting stopped). Upon seeing the situation, Lahens turned around and ran to his truck to retrieve his gun. Lahens heard Rodriguez threaten to shoot Berlin, and Berlin told him to "go ahead." Lahens explained that, after he retrieved his gun from his truck, Sonny Dorelie, a man with the other group, "came at [Lahens] very aggressively" and starting "pushing him" and "grabbing [him]." Unable to push Dorelie away, Lahens hit Dorelie in the face with the butt of his gun. Having disengaged with Dorelie, Lahens observed that Rodriguez, who still had his

gun pointed at Berlin, was backing away from Berlin and "was pretty much by his car already." Lahens aimed his gun in Rodriguez's direction and shot. Rodriguez never pointed his gun at Lahens or fired his gun. Lahens then left the scene.

Lahen's brother, Berlin, testified that, upon seeing the fight, he went to his "brother's aid" and tried to break up the fight. Berlin maintained that, although he did not fight anyone, Rodriguez put a pistol in Berlin's face. Berlin started yelling and cursing at Rodriguez and dared him to shoot. The next thing Berlin knew, he saw Lahens with a gun pointed at Rodriguez. The fighting had pretty much stopped at this point, and Rodriguez began backing up once Lahens pointed the gun at him, but Rodriguez kept his firearm pointed at Berlin the whole time. When Rodriguez was about 15 to 20 feet away from Berlin, Lahens fired three shots at Rodriguez. Rodriguez never fired any shots and never said anything to Berlin. After Lahens fired the shots, Berlin, Lahens, and their friends left.

Other witnesses testified, including Rodriguez and Dorelie, who disputed Lahens's and Berlin's version of events. For instance, Rodriguez denied pulling a gun or pointing it at Berlin. Instead, he stated that he only obtained his gun from his car after Lahens started shooting. Dorelie testified that he was trying to help break up the fight and deescalate the situation when Lahens hit him in the face with a gun and pointed it at him. Dorelie never saw Rodriguez with a gun.

The district court denied the motion to dismiss, and the case proceeded to trial.  At trial, Lahens's defense was that his actions were justified, and that he only pulled his gun because his brother was being threatened with a gun.  The jury heard testimony from multiple witnesses including, Rodriguez, Dorelie, Berlin, Berlin's girlfriend, and other bystanders who witnessed parts of the incident.

Specifically, Nicole Patrizz and Skyler Andrews, testified that they left the club with Rodriguez, Dorelie, and their friend Holvens Pierre-Louis at approximately 2:30 a.m. and headed to a nearby parking lot.  While they were walking back, Lahens approached the two females and persistently asked for their numbers.  Both women said no.  At some point during this encounter, Lahens grabbed Skyler's arm, and their friend Pierre-Louis intervened and told Lahens to leave the women alone.  Lahens and Pierre-Louis then started fighting, and the other men in both Lahens's group and the females' group joined in on the fighting.

Patrizz and Andrews testified that a guy in Lahens's group (but not Lahens) went to a truck and pulled a gun during the fight, but then he put it away.  At which point, Lahens pulled a gun, hit Dorelie in the face, and pointed the gun at Rodriguez and started shooting.  Patrizz could not say whether Dorelie approached Lahens or Lahens approached Dorelie, but Andrews testified that Dorelie was "running" toward Lahens when Lahens hit him.

Patrizz and Andrews said that Rodriguez did not have a gun at that point.

Pierre-Louis testified to a similar version of events and explained that Dorelie had intervened in the fight "trying to diffuse, trying to stop anything else from happening." Pierre-Louis explained that he saw one of the men in Lahens's group grab a pistol, and Pierre-Louis yelled out to alert Rodriguez that they had a gun. The individual then put the gun back in the car. Pierre-Louis then explained that Dorelie was talking to Lahens and trying to calm him down when he saw Lahens grab a gun and hit Dorelie in the face.

Dorelie testified that, when he saw Pierre-Louis fighting with three other guys, he ran toward the fight. He explained that by the time he got there, the fight had basically stopped, but both groups were yelling and arguing with each other. He grabbed one of the guys (not Lahens) that had been fighting and told him to "chill. Let's somebody squash all of this right now. Let's chill right now. Let's end this right now." Dorelie explained that he was "trying to get everyone to just shut up" and end the situation. Dorelie heard someone yell gun,[3] he saw Rodriguez was on the ground, and then someone sucker punched Dorelie. When Dorelie turned back around, he was "immediately" "hit in the face" with a metal object before he could see anything. And when Dorelie opened his eyes, Lahens had a gun pointed in his face, and

---

[3] Dorelie did not know who had a gun, and he did not see a gun.

he was looking toward Rodriguez's car. Lahens asked Dorelie whether Rodriguez had a gun. Dorelie told Lahens "man, just let it go." Lahens then pointed the gun toward Rodriguez's car, which Rodriguez was hiding behind and fired three shots. After firing, Lahens pointed the gun back at Dorelie, and then Lahens's group got in their car and sped off.

Dorelie emphasized that he was talking to "all [of] them" before Lahens hit him with a gun. He explained,

> I told everybody basically, let's end this. Let's squash this. I wasn't rude. I didn't curse, nothing like that. I didn't come at nobody with threatening gestures. I didn't act like I was reaching for any kind of weapon. I didn't ball my fist. I said let's kill this right here. That's it. I didn't say nothing rude, I didn't curse. I didn't curse at nobody.

On cross-examination, Dorelie denied walking with Lahens toward Lahens's truck, and denied having any conversation with Lahens before being hit with the gun. Instead, he maintained that he was talking generally to everyone, trying to get everyone to end the situation. Dorelie admitted that he omitted from his statement to police that Lahens pointed the gun at him, explaining that he was "really shook up" when he made the statement. Dorelie denied that he was trying to stop Lahens when he got hit with the gun.

Rodriguez testified that, when he saw Pierre-Louis in a fight, he ran toward the fight, and he was immediately hit and fell to the

ground. He heard Pierre-Louis yell "gun," and Rodriguez ran to his car to take cover. Lahens started shooting, and Rodriguez got his gun out of his car. He did not see Dorelie get hit in the face. After the third shot, Rodriguez came around his vehicle and aimed the gun at Lahens, but Lahens had already turned to leave. Rodriguez did not shoot, and he denied pulling his gun first or ever pointing it at anyone else.

Lahens did not testify at trial, but the prosecution played an audio recording of a statement that Lahens made to police. In this statement, Lahens admitted that he hit Dorelie in the face with the gun. When asked what Dorelie was doing at the time, Lahens stated "oh well he was a Samaritan breakin' it up." When asked how Dorelie got hit in the face with the gun, Lahens stated, "[o]h well he came when I got my gun he jumped in my face and that's when I hit him with it." Detectives testified that Lahens's story "changed several times from the beginning to the middle to the end, in a lot of different areas." For instance, initially Lahens told police "several times" that he was alone, that Rodriguez's group had picked a fight with him and pulled a gun on him, and he pulled one in response. When confronted with the fact that multiple witnesses indicated Lahens was not alone, Lahens admitted that his brother was with him. Lahens told detectives that he did not mention anyone else with him because "he didn't want to get his friends involved." One of the detectives testified generally, without getting into specifics, that Lahens's description of Rodriguez's and Dorelie's actions also changed. Finally, one of the

detectives stated that Lahens "kept referring to someone that was a good Samaritan trying to break it up."

Berlin testified that, when he saw his brother in a fight, he ran to try and break up the fight. As he was trying to break things up, Rodriguez shoved a gun in his face. Berlin then heard shots ring out, and Berlin turned to see Lahens shooting. Rodriguez had the gun pointed at Berlin the entire time but was backing up toward his vehicle when the shooting started.[4] After Lahens fired three shots, they left. Berlin's girlfriend corroborated his story.

Following deliberations, the jury found Lahens guilty of the lesser-included offense of attempted second degree murder of Rodriguez and aggravated battery with a firearm of Dorelie. Lahens was sentenced to the minimum-mandatory 20-year term of imprisonment.

Following his direct appeal, Lahens filed a motion for postconviction relief, pursuant to Fla. R. Crim. P. 3.850, arguing in relevant part, that his trial counsel was ineffective for failing to (1) introduce at trial Lahens's testimony from the pre-trial motion to dismiss hearing; and (2) request a justifiable use of non-deadly force instruction for the aggravated battery charge involving victim Dorelie. The state postconviction court summarily denied the ineffective assistance claim based on the failure to admit the pre-

---

[4]Neither Berlin nor his girlfriend testified to any details regarding Lahens's encounter with Dorelie.

22-13228              Opinion of the Court              11

trial testimony, but granted an evidentiary hearing on the claim related to the non-deadly force jury instruction.

At the evidentiary hearing,[5] Patrick Cairns, Lahens's trial counsel, explained that Lahens did not testify at trial, and Lahens had said in his statement to the police "a couple of times" that Dorelie was a good Samaritan trying to break up the fight when Lahens hit him with the gun. Thus, Cairns explained that "there was nothing to suggest that [Dorelie] hit anybody." Accordingly, he did not request an instruction on the use of non-deadly force because he "didn't want to lose credibility with the jury." Instead, he argued as a defense that Lahens's hitting Dorelie was an "accident"—"a simple battery, that in the heat of the moment, somebody was there and [Lahens] struck him thinking it was, you know, one of the other assailants."

Lahens questioned Cairns on cross-examination about why Cairns did not pursue a non-deadly use of force instruction given that Lahens had told Cairns that Dorelie had "aggressively grabbed [him] and would not let go." Cairns explained that he could not do so because Lahens had not stated in his statement to police that Dorelie grabbed him; Lahens did not testify at trial; and Cairns cross-examined Dorelie to try and bring up that Dorelie had grabbed Lahens, "but [Dorelie] wouldn't admit" that he had done so. In response, Lahens pointed out that he had testified at the pre-trial evidentiary hearing on his motion to dismiss that Dorelie had

---

[5] Lahens proceeded *pro se* at this evidentiary hearing.

grabbed him and would not let go and asked why Cairns had not presented that evidence to the jury. Cairns stated that "the State objected that it was hearsay. . . . If we wanted to get that statement in, you would have had to testify during the trial."

Following the hearing, the state postconviction court found Cairns "to be a credible witness who articulated a reasonable trial strategy based on his investigation and analysis of the evidence." The trial court explained that counsel's "decision not to request an instruction on the justifiable use of non-deadly force was reasonable under the facts and circumstances of this case." Lahens appealed the denial of both claims. On appeal, Florida's Fifth District Court of Appeal ("DCA") reversed the summary denial and remanded for a second evidentiary hearing on the ineffective assistance claim based on the failure to admit the pre-trial testimony. However, it affirmed the denial of the ineffective assistance claim based on the jury instruction.

At the second evidentiary hearing,[6] Lahens testified that he believed his trial counsel should have attempted to admit his prior testimony from the pre-trial evidentiary hearing because the testimony would have helped with his theory that his actions were justified, particularly given that he did not testify at trial. Lahens stated that he had wanted to testify, but his counsel advised him not to. Lahens stated that he ultimately decided not to testify, but he requested that his trial counsel submit Lahens's testimony from

---

[6] Lahens retained counsel for the second evidentiary hearing.

22-13228              Opinion of the Court              13

the prior evidentiary hearing.  However, his counsel "told [him] that he couldn't submit it for whatever reason."

On cross-examination, Lahens denied that he told police that Dorelie was acting as good Samaritan.  He then admitted that he used the word "samaritan" in his statement to police, but he explained that he "meant to say pedestrian."  When asked whether Dorelie was "trying to break things up," Lahens stated "[a]t the time, that's what I believed."  He admitted that he described Dorelie's actions differently at the pre-trial hearing when he testified that Dorelie had grabbed him and acted aggressively.

Cairns testified that he thought he had attempted to introduce the testimony from the pre-trial evidentiary hearing but that the trial judge would not allow it.  However, later, he testified that he was not entirely sure that he had sought to admit the transcript.  He recalled that "[t]here was some issues with that testimony being a little different than what was originally reported."  Specifically, there were things in the testimony from the pre-trial evidentiary hearing that Cairns "discussed with Mr. Lahens that [Cairns] thought [he] didn't really want the jury to have to consider or decide."  He again highlighted that there were "some inconsistencies with" Lahens's statement to police and his pre-trial evidentiary hearing testimony.  He further explained that there "was also a strategic reason not to [bring in the transcript] because there [were] some inconsistencies with what went on between [Lahens's] testimony and his brother's."

Following the second evidentiary hearing, the state postconviction court denied Lahens's claim on the merits. The court noted that Cairns had testified that he tried to have the pre-trial testimony admitted, even though "there was also a strategic reason not to introduce the hearing testimony" due to inconsistencies between Lahens's and Berlin's testimony. The trial court concluded that there was "no deficient performance or prejudice arising out of [counsel's] failure to get the transcript into evidence." Lahens appealed, and the Fifth DCA summarily affirmed. Lahens filed a motion for rehearing, which was denied.

Thereafter, Lahens, proceeding *pro se*, filed the underlying 28 U.S.C. § 2254 petition for a writ of habeas corpus, asserting among other claims, the two ineffective-assistance claims discussed above. The district court denied the § 2254 petition on the merits and denied a certificate of appealability. As noted previously, we granted a certificate of appealability on the two ineffective-assistance claims discussed above. We also appointed counsel to represent Lahens in this appeal.

## II.    Standard of Review

We review the district court's denial of a § 2254 habeas petition *de novo*. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court's review of a final state habeas decision is greatly circumscribed, and a federal habeas court cannot grant a state petitioner habeas relief on any claim that was adjudicated on

the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

"'[C]learly established Federal law' . . . refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "[T]o be 'contrary to' clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward*, 592 F.3d at 1155 (quotations omitted); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

An "unreasonable application" of federal law occurs "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Bell*, 535 U.S. at 694. "To meet [the unreasonable application] standard, a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (quotations

omitted). Rather, the state court's application of federal law "must be objectively unreasonable," *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotations omitted), meaning that "the state court's decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement," *Shinn*, 592 U.S. at 118 (quotations omitted). In other words, where AEDPA deference applies, we are precluded from granting federal habeas relief "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (*en banc*) (quoting *Harrington*, 562 U.S. at 101).

When as here, the last state court to decide the claim does so without accompanying explanation, a "federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). We then "presume that the unexplained decision adopted the same reasoning." *Id.*

Finally, under AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III.    Discussion

Lahens argues that the state court unreasonably applied federal law and made an unreasonable determination of the facts in concluding that his trial counsel was not ineffective for failing to

(1) introduce at trial a transcript of Lahens's testimony from the pre-trial evidentiary hearing, and (2) request a jury instruction on the use of justifiable non-deadly force for the aggravated battery with a firearm charge.[7]  After reviewing the applicable law, we address each argument in turn.

To make a successful claim of ineffective assistance of counsel, a defendant must show both that (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Prejudice occurs when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  Failure to establish either the deficient performance prong or the prejudice prong is fatal and makes it unnecessary to consider the other.  *Id.* at 697.

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under § 2254. *Harrington*, 562 U.S. at 101.  Accordingly, where, as here, "§ 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether *there is any reasonable argument*

---

[7] The State argues that Lahens's claims are procedurally barred because they are unexhausted.  We need not reach this issue because the claims fail on the merits.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

*that counsel satisfied Strickland's deferential standard."* *Id.* at 105 (emphasis added). With these principles in mind, we turn to Lahens's claims.

### A. *Ineffective Assistance Claim Based on the Failure to Introduce the Pre-trial Testimony*

Lahens argues that his trial counsel was ineffective for failing to introduce Lahens's pre-trial testimony from the evidentiary hearing on the motion to dismiss the indictment. He maintains that this testimony would have supported his theory of self-defense for the aggravated battery charge because he testified at the pre-trial hearing that Dorelie grabbed him and pushed him while Rodriguez had a gun pointed at Lahens's brother's head. He maintains that, had the jury heard about Dorelie's aggressive behavior, it would have found him not guilty of aggravated battery.

The state court explained that Lahens's trial counsel, Cairns, had testified that he tried to have the pre-trial testimony admitted, but the trial court had denied his request. The court noted that Cairns also testified that "there was . . . a strategic reason not to introduce the hearing testimony" due to inconsistencies in the testimony. Thus, the state court concluded that there was "no deficient performance or prejudice arising out of [counsel's] failure to get the transcript into evidence."

The state court's decision was not an unreasonable application of *Strickland* nor was it based on an unreasonable determination of the facts in light of the evidence presented in the

state court proceeding.  Although Lahens is correct that nothing in the transcript establishes that Cairns attempted to enter Lahens's pre-trial testimony into evidence, Cairns clarified in his testimony that he thought he had tried to admit the testimony during a bench conference, but he could not recall for sure whether he had actually done so.  Counsel clarified that there were things in Lahens's testimony from the pre-trial evidentiary hearing that Cairns "discussed with Mr. Lahens that [Cairns] thought [he] didn't really want the jury to have to consider or decide."  He further explained that there "was also a strategic reason not to [bring in the transcript] because there [were] some inconsistencies with what went on between [Lahens's] testimony and his brother's."[8]  The state court highlighted Cairns's testimony about the reasons not to introduce the statement in denying Lahens's claim.  It is well-established that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Strickland*, 466 U.S. at 690; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (explaining that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently unreasonable

---

[8] The record confirms that there were inconsistencies between Lahens's pre-trial testimony and the other evidence.  For instance, Lahens testified at the pre-trial hearing that he heard Rodriguez threaten to shoot Berlin, but Berlin testified that Rodriguez never said anything to him.  And in his statement to police, Lahens indicated Dorelie was a good Samaritan trying to break up the fight when he hit him, but then at the pre-trial hearing, he said the opposite, indicating Dorelie "came at [him] very aggressively" and grabbed him and would not let go.

that no competent attorney would have chosen it" (quotations omitted)).  Accordingly, based on Cairns's testimony, we conclude that the state court's decision that Cairns's performance was not deficient was neither an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts presented in the state court proceeding. Therefore, Lahens is not entitled to relief on this claim.

### B. Ineffective assistance claim based on the jury instruction

Lahens argues that his trial counsel was ineffective for failing to request a jury instruction on the justifiable use of non-deadly force, which left the jury no choice but to convict him of the aggravated battery of Dorelie.  He asserts that counsel's explanations for why he did not request an instruction were contradictory, and he maintains that, if the jury had received the non-deadly force instruction, there is a reasonable probability that he would not have been convicted of aggravated battery.

The state court credited Cairns's testimony that he had considered a non-deadly force instruction,[9] but he did not request one because he did not want to lose credibility with the jury given Lahens's statement to police that Dorelie was acting as a good Samaritan when Lahens hit him.  Thus, the state court concluded

---

[9] In Florida, a defendant is entitled to have the jury instructed on the law applicable to his theory of defense when there is any evidence, no matter how weak, introduced at trial supporting the defense theory. *Larsen v. Florida*, 82 So. 3d 971, 974 (Fla. 4th DCA 2011).

that Cairns was not deficient because his decision was reasonable under the circumstances. Although Lahens quarrels with Cairns's characterization of the evidence and maintains that Dorelie grabbed him aggressively, as Cairns testified, this information did not come out during the trial because Lahens did not testify and Cairns could not get Dorelie to make such an admission on cross-examination.

Alternatively, Lahens argues that even without evidence that Dorelie grabbed him aggressively, Cairns still could have requested the non-deadly force instruction based on Lahens's statement to police that he hit Dorelie after "he jumped in [Lahens's] face," and testimony from Andrews that Lahens was walking towards his vehicle when Dorelie followed him. However, as discussed above, under AEDPA, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. Based on Cairns's testimony that he made a strategic decision not to request a non-deadly force instruction so as not to lose credibility with the jury in light of the evidence presented at trial that Dorelie was acting as a good Samaritan, the state court's decision that Cairns was not deficient was not an objectively unreasonable application of *Strickland*. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Dingle*, 480 F.3d at 1099 (explaining that counsel's strategic decision "will be held to have been ineffective assistance only if it was so patently

unreasonable that no competent attorney would have chosen it" (quotations omitted)).   Nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Moreover, although the state court did not reach the prejudice prong,[10] we note that, in light of the evidence presented at trial, even if the jury had received a non-deadly force instruction, Lahens has not established prejudice.   Under Florida law, "[n]on-deadly force may be used when and to the extent that a person reasonably believes that the use of force is necessary to defend one's self or another against the imminent use of unlawful force."   *Cruz v. State*, 971 So. 2d 178, 182 (Fla. 5th DCA 2007). Multiple witnesses testified consistently that Dorelie did not act aggressively toward Lahens and was simply trying to deescalate the situation when Lahens hit him.   And although Lahens stated in his statement to police that Dorelie "jumped in [Lahens's] face and that's when he hit him," Lahens also confirmed in that statement that Dorelie was acting as a good Samaritan trying to break up the fight.   Based on the evidence presented at trial, even if the jury had received the justifiable use of non-deadly force instruction, Lahens has not shown that there is a reasonable probability that the jury would have concluded that he reasonably believed that the use of force was necessary to defend himself or anyone else against "the

---

[10] Where the state court does not reach one of *Strickland*'s elements, § 2254(d)'s framework does not apply, and we examine that element *de novo*. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

imminent use of unlawful force" by Dorelie.  *See Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").  Therefore, Lahens is not entitled to relief on this claim.

## IV.    Conclusion

For the above reasons, we affirm.

**AFFIRMED.**